John A. STOCKMAN, Claimant,
Respondent,

v.

JOHN T. CLARK & SON OF
BOSTON, INC.,

and

American Mutual Liability Inc. Co.,
Employer/Carrier, Petitioners,

Director, Office of Workers' Compensation Programs, United States Department of Labor, Party in Interest.

No. 75–1360.

United States Court of Appeals,
First Circuit.

Argued Jan. 5, 1976.

Decided July 27, 1976.

George O. Driscoll, Chestnut Hill, Mass., for petitioners.

Joseph P. Flannery, Boston, Mass., with whom Joseph G. Abromovitz and Kaplan, Latti & Flannery, Boston, Mass., were on brief, for John A. Stockman, respondent.

Linda L. Carroll, Atty., U. S. Dept. of Labor, with whom William J. Kilberg, Sol. of Labor, and Laurie M. Streeter, Associate Sol., Washington, D. C., were on brief, for Director, Office of Workers' Compensation Programs, party in interest.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

This petition for review, brought by an employer and its compensation carrier, raises a difficult question of interpreting the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act (the Act). 33 U.S.C. § 901 et seq.

Working on the Boston waterfront for his employer, John T. Clark & Son of Boston, Inc. (Clark), John A. Stockman sustained an inguinal hernia on October 1, 1973, while removing the contents of a container[1] which had previously been off-loaded from a vessel. Clark and its insurer, acknowledging liability under Massachusetts workmen's compensation law, furnished Stockman with medical care and paid him compensation at the maximum weekly state rate of $80 during the seven weeks that he was disabled. Stockman claimed, however, that he was entitled to be compensated at the much higher rate provided in the Longshoremen's and Harborworkers' Compensation Act. Total benefits payable under the Act for the period of disability in question exceeded those payable under Massachusetts law by more than $700. When Clark and its carrier refused to acknowledge that Stockman was covered by the Act, the matter was referred to an Administrative Law Judge, § 919, who ruled after hearing that Stockman was covered. Clark and the carrier appealed from this ruling to the Benefits Review Board (the Board), § 921(b) (1976 Supp.), which affirmed the decision of the Administrative Law Judge. Thereafter they brought this petition, § 921(c) (1976 Supp.).

I

The difficulty in determining Stockman's coverage arises from the essential ambiguity of the 1972 amendments insofar as they describe, or fail to describe, the employees for whom coverage is afforded. As was developed at the hearing before the Administrative Law Judge, Stockman was a regular employee of Clark who had for three

---

1. Containers are rectangular metal structures used to transport cargo. After being taken off the vessel by crane, they are provided with a chassis and wheels and converted into large box trailers capable of being trailed on the highways by tractors.

years prior to his injury worked at Berth 5 of the Boston Army Base, an area adjacent to Boston Harbor. Clark is both a stevedore, i. e. a firm engaging directly in the unloading of vessels, and a terminal operator.[2] Clark's Boston Army Base facility was used both to unload vessels that berthed there, and to store and warehouse cargo which had either been unloaded there or been brought in containers from vessels berthed elsewhere.

At the time Stockman sustained a hernia, he was at Berth 5 of the Boston Army Base "stripping" (removing cargo from) a container. The container had been discharged from a vessel that had berthed during the previous three days at Berth 17, Castle Island, a facility located approximately two miles by land or 700–800 feet across water from the Boston Army Base. Under the terms of its contract with Sea-Land Corporation, the owner of the container, Clark was "to unload vessels as they come into port [and] discharge the containers." However, Sea-Land's container vessels did not dock at the Army Base since they require a special crane and berth not available there. Sea-Land's vessels berthed instead at Castle Island, where the containers were put ashore; chassis with wheels were provided; and those containers having full loads for a particular consignee were hitched to a truck-tractor and hauled directly to their ultimate destinations, to be unloaded by the consignee. Some containers would not, however, contain a full load for one consignee and it was up to Clark to strip them, separate their contents by orders, and hold the goods for pickup by consignees. In such cases, as there were no facilities at

Castle Island either for stripping or for "stuffing" (placing cargo in) containers, the containers would first be hauled by an independent trucking firm, engaged by Sea-Land, to Clark's Boston Army Base facility. There Clark would remove the contents from the containers, place them on pallets, and hold them for pick-up by truckers for the various consignees. The container Stockman was stripping had been hauled overland from Castle Island by a truck furnished by the Boston-Taunton Transportation Company under contract with Sea-Land; and Stockman was removing the contents and placing them on pallets at Berth 5 of the Boston Army Base when he sustained his injury.

At the hearing various descriptions were offered of Stockman's job-title. Mr. Kelley, Clark's treasurer, called Stockman a "freight handler" as "that's the insurance code classification that he would fall under". Stockman himself testified that he was classified as a crane operator and for casual work on the dock. He said he drove chisels, stuffed and stripped containers, and shifted cargo. The parties stipulated that Stockman was "employed as a longshoreman with collateral ratings as a cooper and extra dock laborer". Stockman was a member of the International Longshoremen's Association, AFL–CIO, and Clark a member of the Boston Shipping Association, Inc. Under an agreement between the ILA and the Shipping Association, containers within 50 miles of a port (other than ones handled by the "beneficial owners" of the cargo) had to be stuffed and stripped by ILA longshore labor working on a "waterfront facility, pier or dock."

**2.** Mr. Kelley, Clark's treasurer, gave his view of the difference between a stevedoring and a terminal operation as follows:

"The distinction is the point of rest. Cargo that is—whether it be containers or freight bulk cargo—when the longshore gangs are working the cargo and discharging it and they bring that cargo to a point of rest, either in a shed or outside a shed, and they terminate, they finish their job, that's the end of the stevedoring function, and from that point on the terminal operation function takes over, it's somewhat similar to a warehousing operation."

Under Kelley's theory, once the stevedoring function ended, the work became freight handling.

Stockman, on the other hand, insisted,

"Cargo is merchandise that's carried in a vessel and I maintain that cargo does not become freight until after it's grounded on the dock (viz. trucking dock) and the truck driver comes in and touches it. ILA [the International Longshoremen's Association, of which Stockman was a member] helps handle it all the way until it's actually taken out of that container. The container in my opinion is more or less part of the ship."

## II

The relevant provisions of the Act against which Stockman's claim of coverage must be measured are §§ 902(3), 902(4) and 903(a), all as amended in 1972. Section 903(a), entitled "coverage", is sometimes referred to as the "situs" requirement, and provides as follows:

"Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel). . . . "

Section 902(3), sometimes referred to as the principal "status" requirement, defines and limits the term "employee" to,

"any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker [exclusive of a master or member of a crew of any vessel, or any person engaged to load, unload or repair any small vessel under eighteen tons net]."

There is also the following definition of "employer" in § 902(4),

"an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel)."

The Administrative Law Judge, whose reasoning the Benefits Review Board affirmed; ruled that Stockman's injury occurred at a location within the situs requirements of § 903(a). He found that Stockman was employed to unload containers at Berth 5 of the Boston Army Base; that Berth 5 adjoins navigable waters "and is used for the general cargo operations of loading and unloading vessels, although the stripping of containers received from Berth 17, Castle Island is considered a terminal operation"; and that Stockman's injury met the Act's situs requirements since wharf and terminal areas are specifically mentioned in § 903(a). The Administrative Law Judge attached no weight to the fact that the container had not been discharged from a vessel at Berth 5 of the Boston Army Base but had been driven two miles overland from Castle Island, Berth 5 being, in any event, a "terminal adjoining navigable waters". And even were this not so, Clark's Army Base facilities were an "other adjoining area customarily used by an employer in . . . unloading . . . a vessel," since any and all Sea-Land containers that were to be stripped were customarily trucked there from Castle Island as an integral step in the process of unloading a vessel.

The Administrative Law Judge went on to rule that Clark, being both a stevedore and terminal operator, was an "employer" within § 902(4) since it employed longshoremen to perform some of this work.

Finally, the Judge held that Stockman met the status definition of "employee" under § 902(3), being engaged in "maritime employment". The Judge thought that little attention should be paid labels such as longshoreman or "freight handler". Stating that it was not the label given but "the nature of the work being performed" that was determinative, the Judge held that "[u]ntil the contents were removed from the containers the unloading procedure had not been completely executed. The unloading of this container was an integral and sequential part of the process of unloading cargo from a vessel. *Cf. Powell v. Cargill, Inc.,* [74–LHCA–172 (October 8, 1974)]; *Richardson v. Great Lakes Storage & Contracting Co., et al.,* 74–LHCA–223 (October 18, 1974)". The Judge continued,

"The fact that the containers had to be trucked two miles across the channel for unloading is not significant. The containers, at this point, were not being picked up from storage for further trans-

shipment, but were merely being transported for unloading. If the containers had been stripped by longshoremen at the Castle Island facility where they arrived, this work activity would, in my view, have been clearly covered by the Act. Claimant should not be denied the protection and coverage of the Act merely because circumstances required his Employer to have longshoremen perform the stripping function at another waterfront facility two miles away. *Cf. Crampton v. Cargill, Incorporated,* 74–LHCA–215 . . . . . Such a finding would not be within the humanitarian goals of the Act.

. . . I hold that the Claimant was injured in a shoreside area while he and his Employer were engaged in maritime employment within the coverage of the Act."

In affirming, the Benefits Review Board held it to be "now well settled" that a claimant like Stockman was within the jurisdictional reach of the Act. It said that stripping and stuffing containers were "maritime employment", and that the temporary resting of containers for three days prior to stripping was immaterial to the maritime nature of the employment.

### III

While the Board's determination is consistent with its other recent rulings finding coverage for most handlers of ship's cargo at piers and waterfront terminals, whatever their precise function, judicial decisions to date construing the 1972 amendments reflect a sharp difference of opinion over the reach of the Act. A divided panel of the fourth circuit has ruled that terminal employees, as distinct from those immediately engaged in taking cargo from (or putting it on) a vessel lying at its berth, are not covered even when injured in an area more immediately adjacent to the ship's berth than was the Boston Army Base here. Terminal employees are not, in its view, engaged in maritime employment within the meaning of § 902(3). *I.T.O. Corp. v. Benefits Review Board,* 529 F.2d 1080 (4 Cir. 1975), reargued *en banc* May 4, 1976. The court felt that while the 1972 amendments enlarged the "situs" so as to provide compensation for injuries occurring at designated shoreside facilities as well as on shipboard, they narrowed the "status" requirement so as to limit coverage to only maritime workers engaged most directly in traditional employment, e. g., in cases of longshoremen, those immediately engaged, at the time of injury, in the direct loading or unloading of a vessel itself. To give effect to its interpretation of the amendments, the fourth circuit read into the Act the notion of "point of rest", a point shoreward of which the handling of cargo would cease to be covered by the Act.

A divided second circuit panel has rejected altogether the fourth circuit's point of rest approach. *Pittston Stevedoring Corp. v. Dellaventura,* Nos. 76–4042, –4009, –4043, –4249 (July 1, 1976) (Friendly, J.). In *Pittston,* one of the employees was a "checker" who, like Stockman, was stripping a container of goods destined to different consignees at a waterfront area remote from where the ship had been unloaded. The court held that stripping was the "functional equivalent" of sorting cargo discharged from a ship, and was covered by the Act.

From the present judicial melange[3] can be gathered the truth of Judge Friendly's remark:

"Given the importance of the question, the number of courts of appeals endeavoring to find an answer, and the divergence of opinion already manifested, it seems unlikely that the opinion of any court of appeals will be the last word to be said." Slip op. at 4683.

---

**3.** The ninth circuit has also recently interpreted the coverage provisions of the Act, though on facts so different (longshoremen were not involved) as to make the decision of little relevance here. *Weyerhaeuser Co. v. Gilmore,* 528 F.2d 957 (9th Cir. 1975), *petition for cert. filed.*

44 U.S.L.W. 3645 (U.S. May 6, 1976) (No. 75–1620). The court emphasized that for an employee to be eligible, his own work and employment must have a "realistically significant relationship" to traditional maritime activity.

## IV

Before expressing our views on the merits, we turn to several preliminaries. First, we consider whether in deciding the scope and coverage of the Act, we should give weight to the presumption stated in § 920 that "the claim comes within the provisions of this chapter". We think not. This provision relieves an injured employee from a perhaps bothersome burden in cases where coverage is uncontested, and it may well denote a policy favoring coverage in close cases; but we do not think it bears on the decision before us calling for a general construction of "whether Congress placed the line at the 'point of rest' or much further landward". *Pittston, supra,* at 4703–04. This basic interpretative decision must precede any application of the presumption.

Second, we do not see the decision before us as one where we owe a special deference to the decision of the Board (and of the Administrative Law Judge, whose views were seemingly carried forward in the Board's shorter opinion). Judge Craven, dissenting in *I.T.O., supra,* 529 F.2d at 1091, quoted the Supreme Court in *NLRB v. Boeing,* 412 U.S. 67, 75, 93 S.Ct. 1952, 36 L.Ed.2d 752 (1973), to the effect that "[a] consistent and contemporaneous construction of a statute by the agency charged with its enforcement is entitled to great deference by the courts." Under § 939 the Secretary is directed to administer the Act and to make necessary rules and regulations, and under § 921 (1976 Supp.) the Benefits Review Board, with members appointed by the Secretary, is charged with determining appeals subject to review by courts of appeals. Judge Craven concluded that the Board, in "an unbroken line of decisions", has consistently and reasonably interpreted the coverage provisions found in the 1972 amendments, and that this interpretation should be accorded " 'great weight' " by a court. 529 F.2d at 1092.

But while the Board's views are obviously to be regarded with interest and respect, we do not think we are justified in a case of this character in subordinating our own judgment. Professor Davis' discussion is particularly helpful in considering how much deference a court ought to accord to agency determinations. 4 Davis, Administrative Law Treatise § 30.09 et seq. He suggests three criteria: (1) the relative expertise of agency and court; (2) whether there is express statutory delegation of a question to the agency; and (3) whether the problem involves general propositions or the application of such propositions to specific facts.

The first criterion, the expertise of the court relative to that of the agency, depends in turn upon the nature of the question to be decided. Here the Secretary of Labor and the Board may know more about the technical aspects of work on the waterfront, the needs of workers, and the labor management issues intertwined with the Act, but they have no greater expertise than a court in construing statutes, judicial decisions and legislative history, and the latter is the paramount task before us.

The second criterion is the extent to which Congress may have expressly entrusted the question to the agency rather than to a court. Here Congress entrusted to the Secretary the daily administration of the Act, but created an independent Benefits Review Board to determine appeals "raising a substantial question of law or fact" from initial orders, § 921(b)(3) (1976 Supp.), with ultimate review in the courts of appeals. From this structure, we can doubtless infer an intention to grant to the Board, subject to court review, a substantial oversight of questions of law and policy affecting the distribution of benefits in a particular case. Still, we agree with Judge Friendly that the Board is less a policy-making and more an "umpiring" body than is true of agencies such as the National Labor Relations Board, *see Pittston, supra,* at 4706, while the Secretary's own discretion, being subordinate in the legal area to that of the Board, is even more limited. In sum, while on occasion we may well expect to defer to the Secretary or the Board in particular applications, we see neither the Board nor the Secretary as having been commissioned to settle the sort of question,

involving the general construction of an act of Congress, encountered here.

As Davis points out in presenting his third and final criterion, a distinction exists "between enunciation of general propositions or methods of approach and the mere application of such propositions or methods to unique facts." § 30.11, at 253. A question such as whether the Act is to be interpreted to cover all workers in the loading or unloading process, defined broadly, or only those immediately associated with taking the cargo on or off a certain vessel, is the kind of "general proposition" on which courts must provide their own judgment. *Id.* at 254.

■ This is not to overlook our duty to accept the Board's factual findings when supported by substantial evidence. *Pittston, supra,* at 4704. Although not expressly stated in the Act, *compare,* § 921(b)(3) (requiring the Board to accept the supported findings of the Administrative Law Judge), we readily assume the existence of such a duty. Still the material facts are not in dispute, and as the focus is upon the meaning of the statute, the judgment must be our own, not the Board's.

## V

Proceeding, then, to our own assessment of Stockman's status under the current Act, it is useful first to consider the prior law and the changes brought about by the 1972 amendments. Compensation was previously payable only if disability or death resulted from injury occurring upon "navigable waters" including "any dry dock". Recovery was expressly forbidden if recovery could be validly provided under state workmen's compensation laws. The Supreme Court accordingly interpreted the earlier Act to reimburse only injuries seaward of the pier, e. g. on shipboard or other like structure within the narrow confines of the admiralty tort jurisdiction. *Nacirema Co. v. Johnson,* 396 U.S. 212, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969) (no coverage under the Act for injuries to longshoremen occurring on a pier affixed to land); *cf. Victory Carriers, Inc. v. Law,* 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971). Thus before the amendments, the Act was regarded as a rather limited supplement to state workmen's compensation laws,[4] designed not to supersede or improve upon those laws but to fill a gap which the states were without jurisdiction to fill. *Cf. Washington v. Dawson & Co.,* 264 U.S. 219, 44 S.Ct. 302, 68 L.Ed. 646 (1924); *State Industrial Commission v. Nordenholt Corp.,* 259 U.S. 263, 42 S.Ct. 473, 66 L.Ed. 933 (1922); *Southern Pacific Co. v. Jensen,* 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917).

An anomaly was created by this narrow reliance on location or "situs" to delineate the limits of coverage—the same longshoreman who could recover if injured while working on board a ship could not recover if injured a few feet away from the ship on a pier. In *Nacirema* the Court recognized and discussed this seeming unfairness but felt there was little to be done.[5] It dis-

---

4. During the pre-1972 period, longshoremen and harborworkers injured on shipboard (or on land by a ship's appurtenance) could sue the vessel for unseaworthiness as well as for negligence, achieving, in some instances recoveries far beyond anything available under the Act. *Guttierrez v. Waterman S. S. Corp.,* 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed.2d 1099 (1946). The 1972 amendments eliminated the unseaworthiness remedy for longshoremen and harborworkers while greatly increasing the benefits payable under the Act and by enlarging its scope to include injuries on piers and terminals adjoining navigable waters. The amendments also removed the express exclusion for injuries which would be covered under state workmen's compensation laws.

5. The Court said in *Nacirema,*
   "There is much to be said for uniform treatment of longshoremen injured while loading or unloading a ship. But even construing the Extension [of Admiralty Jurisdiction] Act to amend the Longshoremen's Act would not effect this result, since longshoremen injured on a pier by pier-based equipment would still remain outside the Act." 396 U.S. at 223, 90 S.Ct. at 354. The Court concluded that while Congress could draw whatever line it chose, "the plain fact is that it chose instead the line in *Jensen* separating water from land at the edge of the pier. The

cussed the matter in terms of "situs" and "status", terms used by the Administrative Law Judge in the present case (Stockman's injury was said to have occurred within the "situs" provisions of the Act and his employment to meet the "status" provisions). The Court said that it was being urged to extend coverage on the basis of the "status" of longshoremen employed in performing a maritime contract, 396 U.S. at 215, 90 S.Ct. 347, but declined to do so, reading the Act as determining coverage exclusively by the "situs" of the injury. The Court went on to state,

"Congress might have extended coverage to all longshoremen by exercising its power over maritime contracts.[7] [7. ·The admiralty jurisdiction in tort was traditionally 'bounded by locality,' encompassing all torts that took place on navigable waters. By contrast, admiralty contract jurisdiction 'extends over all contracts, (wheresoever they may be made or executed . . . ) which relate to the navigation, business or commerce of the sea.' Since a workmen's compensation act combines elements of both tort and contract, Congress need not have tested coverage by locality alone. As the text indicates, however, the history of the Act shows that Congress did indeed do just that.] But the language of the Act is to the contrary and the background of the statute leaves little doubt that Congress' concern in providing compensation was a narrower one." [Citations omitted.]

396 U.S. at 215–16, 90 S.Ct. at 350.

Against this background, Congress enacted the 1972 amendments. With respect to "situs", it clearly shut the door on any continued interpretation of the Act boundaries as being coextensive with the boundaries of admiralty tort jurisdiction. While

disability or death must still result from an injury occurring upon the "navigable waters of the United States", these are now defined to include shoreside structures such as a pier, terminal, or "other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel". Such facilities, not ordinarily considered to be "navigable waters", have always been outside the exclusive federal admiralty tort jurisdiction. They are areas where the authority of the United States to enact compensation laws for maritime workers overlaps state authority to enact workmen's compensation laws.[6]

Doubtless in part because of this overlap, Congress did not limit its changes in 1972 to a widening of the "situs" requirement. For the first time, it undertook to define the class of persons covered by inserting an inclusive definition of "employee", § 902(3). Thus while "status", as distinct from "situs", was formerly of minor importance, cf. Pennsylvania R. Co. v. O'Rourke, 344 U.S. 334, 73 S.Ct. 302, 97 L.Ed. 367 (1953), it has become a matter of considerable significance. Only an "employee" is covered, defined as "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker . . . ." § 902(3).

VI

In the present case, we hold that the situs requirement of § 903(a) was plainly met, in spite of the distance separating Berth 5 of the Boston Army Base from the Sea-Land berth at Castle Island. Appellants' only substantial argument is their challenge to Stockman's status as a member of the covered class under § 902(3).[7]

invitation to move that line landward must be addressed to Congress, not to this Court." 396 U.S. at 224, 90 S.Ct. at 354.

**6.** As indicated in the text, the Supreme Court went to some length in *Nacirema* to indicate that Congress had power to extend federal workmen's compensation laws for those in maritime employment shoreward, into areas

outside the exclusive admiralty tort jurisdiction.

**7.** Stockman contends that since appellants did not initially shape their argument before us in terms of status, but rather urged that the Army Base facility, not being contiguous with Sea-Land's Castle Island berth, was outside the situs provision, we should decline to consider the issue of status. But status was considered

On the question of situs, the simple fact is that the amended Act defines navigable waters to include "any adjoining pier, wharf, . . . terminal, . . . or other adjoining area customarily used by an employer in loading [or] unloading . . . a vessel". § 903(a). "Adjoining" can only refer to navigable waters; and Stockman was, as even Clark concedes, working at a terminal which adjoined navigable waters. To be sure, the final reference to "other adjoining area customarily used by an employer in loading [or] unloading . . . a vessel", as well as other parts of the statute, suggests that Congress had in mind a terminal associated with the shipboard movement of marine cargoes. But we do not think Congress meant necessarily to limit "adjoining" to only those areas directly adjoining the berth of the specific vessel being unloaded. The terminal here in question is at a location which is customarily used in loading and unloading vessels. Some vessels do, in fact, lie there for loading and unloading. Moreover, the area is several hundred yards directly across open water from the berth of Sea-Land's container vessels and is generally part of the same Boston waterfront area. We are not faced with the stripping of a container at an inland freight depot having only some incidental connection with navigable waters. We therefore conclude, from all these factors, that the situs requirement of § 903(a) has been met.

We thus return to what we regard as the only issue on which appellants could prevail, whether Stockman was engaged in "maritime employment" within § 902(3). We agree generally with Judge Winter, writing for the majority in I.T.O., supra, 529 F.2d at 1084–85, that the terms "maritime employment", "longshoreman" and "longshoring operations" in § 902(3) do not have any such settled meaning that we should decide the case without resort to the legislative history.

We start with the obvious fact that the Act and the relevant House and Senate Reports speak repeatedly of longshoremen, indicating, if it could be doubted, that they are a prime class of employee intended to be benefited. Stockman, the parties stipulated, is a "longshoreman"; he belongs to the ILA; and he works at a waterfront terminal for a stevedore and terminal operator whose chief activity appears to be the handling of shipborne cargo. Clark was under contract to "unload [Sea-Land] vessels as they come into port [and] discharge the containers", and it was in connection with this latter operation that Stockman was injured.

Still, as the second circuit points out, "it is not enough that a claimant calls himself a longshoreman or that a longshoreman's union in a particular port has forced employers to hire its members for such unlongshoremen-like positions as clerks or guards." Pittston, supra, at 4712. To be sure, stuffing and stripping containers is much closer to conventional longshore activity than clerking or guarding, though the analogy is not total because the containers, once landed, are transformed into trailers. The contract between the ILA and the Boston Shipping Association, in evidence here, reflects a negotiated undertaking to use only longshore labor to strip and stuff containers, and to do so exclusively at waterfront facilities. Doubtless the union insisted upon such a provision because otherwise containers could be driven to most any location and discharged there by non-waterfront labor. And its insistence upon the use of longshore labor was not totally arbitrary. Containerization greatly simplifies and speeds up the actual loading and unloading of the ship itself, cutting down the workforce needed for those operations. Much of the loading and unloading that used to take place on or alongside the ship is presumably now reflected in the stuffing and stripping of containers. From the longshoremen's point of view this is "traditional" work,

---

both by the Administrative Law Judge and by the Board, and we think no purpose is served in bifurcating the issues at this stage, the ultimate question being one of construing the statute as a whole. In a reply brief, appellants have belatedly briefed the status issue.

and, as further discussed below, there is much to support their position.

But while such considerations indicate that stuffing and stripping—unlike clerking and guarding—cannot be dismissed as beyond the reasonable purview of longshore work, they do not tell us what coverage Congress had in mind. Before proceeding further, we set forth the relevant passages from the House Report:

## "EXTENSION OF COVERAGE TO SHORESIDE AREAS

"The present Act, insofar as longshoremen and ship builders and repairmen are concerned, covers only injuries which occur 'upon the navigable waters of the United States.' Thus, coverage of the present Act stops at the water's edge; injuries occurring on land are covered by State Workmen's Compensation laws. The result is a disparity in benefits payable for death or disability for the same type of injury depending on which side of the water's edge and in which State the accident occurs.

"To make matters worse, most State Workmen's Compensation laws provide benefits which are inadequate; even the better State laws generally come nowhere close to meeting the National Commission on State Workmen's Compensation Laws recommended standard of a maximum limit on benefits of not less than 200% of statewide average weekly wages.   .   .   .

.    .    .    .    .

"It is apparent that if the Federal benefit structure embodied in Committee bill is enacted, there would be a substantial disparity in benefits payable to a permanently disabled longshoreman, depending on which side of the water's edge the accident occurred, if State laws are permitted to continue to apply to injuries occurring on land. It is also to be noted that with the advent of modern cargo-handling techniques, such as containerization and the use of LASH-type vessels, more of the longshoreman's work is performed on land than heretofore.

"The Committee believes that the compensation payable to a longshoreman or a ship repairman or builder should not depend on the fortuitous circumstance of whether the injury occurred on land or over water. Accordingly, the bill would amend the Act to provide coverage of longshoremen, harbor workers, ship repairmen, ship builders, shipbreakers, and other employees engaged in maritime employment (excluding masters and members of the crew of a vessel) if the injury occurred either upon the navigable waters of the United States or any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other area adjoining such navigable waters customarily used by an employer in loading, unloading, repairing, or building a vessel.

"The intent of the Committee is to permit a uniform compensation system to apply to employees who would otherwise be covered by this Act for part of their activity. To take a typical example, cargo, whether in break bulk or containerized form, is typically unloaded from the ship and immediately transported to a storage or holding area on the pier, wharf, or terminal adjoining navigable waters. The employees who perform this work would be covered under the bill for injuries sustained by them over the navigable waters or on the adjoining land area. The Committee does not intend to cover employees who are not engaged in loading, unloading, repairing, or building a vessel, just because they are injured in an area adjoining navigable waters used for such activity. Thus, employees whose responsibility is only to pick up stored cargo for further trans-shipment would not be covered, nor would purely clerical employees whose jobs do not require them to participate in the loading or unloading of cargo. However, checkers, for example, who are directly involved in the loading or unloading functions are covered by the new amendment. Likewise the Committee has no intention of extending coverage under the Act to individuals who are not employed by a person who is

an employer, i. e. a person at least some of whose employees are engaged, in whole or in part in some form of maritime employment. Thus, an individual employed by a person none of whose employees work, in whole or in part, on navigable waters, is not covered even if injured on a pier adjoining navigable waters."

H.R.Rep. No. 92–1441, 92d Cong., 2d Sess., U.S.Code Cong. & Admin.News 1972, pp. 4698, 4707.

Two other courts of appeals have already interpreted the Act in light of these passages, coming to quite different conclusions. Judge Winter, writing in *I.T.O.* for the fourth circuit, read the committee reports as limiting coverage to those engaged in the immediate loading and unloading of ships, particularly in view of the stated intent of the committees to achieve uniform compensation of employees who would otherwise be covered for part of their activity. The fourth circuit then went on to limit coverage to injuries occurring between the first dockside holding area and the ship.[8]

■ The second circuit, to the contrary, emphasizing the committee's concern for a "uniform compensation system", read the legislative reports as manifesting an intention to cover, rather more broadly, those taking part at the designated sites in the complex process of loading or unloading a vessel, though it rejected (as do we) one commentary's shotgun approach that "all employment-related injuries which occur within the Act's territorial limits" be covered. G. Gilmore & C. Black, Law of Admiralty § 6–51, at 430 (3d ed. 1975), *quoted in Pittston, supra*, at 4719–20 & n. 27. In refusing to follow the fourth circuit, the second circuit made much of the fact that "employee" under the Act includes "any longshoreman" as well as "other person en-

gaged in longshoring operations". Thus "[a] 'longshoreman' may . . . be covered at some times even when he is not engaged in traditional longshoring activity." *Id.* at 4712. We agree with Judge Friendly that, whatever the workers covered, a claimant's status need not depend wholly on the job being performed at the very moment of injury.

It seems clear that, however construed, the House Committee Report, and the similar Senate Committee Report, Sen.Rep. No. 92–1125, 92d Cong. 2d Sess., go only part way towards clarifying the application of the 1972 amendments in the present situation. None of the mentioned examples refer to someone like Stockman. Stockman is plainly not an employee "whose responsibility is only to pick up stored cargo for further trans-shipment"; nor do we think that hauling the trailer from the Sea-Land berth to the Boston Army Base for stripping can be viewed as picking up stored cargo for trans-shipment. Indeed, Congress has seemingly gone out of its way to avoid taking any express stance on the status of those engaged in stuffing and stripping containers as part of the loading and unloading process just as it is silent on the status of other terminal employees engaged in moving, storing and culling cargo on the pier. Still, while scarcely explicit, the legislative reports do convey several relevant messages:

1. The amendments are to be construed to achieve a "uniform compensation system" which does not depend on the "fortuitous circumstance of whether the injury [to the longshoreman] occurred on land or over water".

2. The amendments are to afford coverage to employees, or possibly classes of employees, who would otherwise have been

8. Judge Winter acknowledged that the point of rest rule so formulated might result in coverage for a longshoreman working exclusively on shore between the point of rest and the ship. While such a shorebound worker would never have been covered under the old Act, Judge Winter felt that coverage could be inferred from the committee language as a whole and

the liberality of construction to be afforded remedial legislation of this type. *I.T.O., supra*, at 1088. Inexplicably, Judge Winter did not discuss the opposite side of the coin: the failure of a point of rest rule to cover a longshoreman who works part of the time on vessels but whose injury occurs while he is working at a covered situs shoreward of the point of rest.

covered for part of their activity by the earlier Act.

3. One of the reasons for affording coverage on land is that "with the advent of modern cargo-handling techniques, such as containerization and the use of LASH-type vessels, more of the longshoreman's work is performed on land than heretofore".

Attempting to reconcile these notions, we are not satisfied with the "point of rest" theory advanced by the fourth circuit. To be sure, the committee reports state that coverage is for employees who formerly would have been covered for part of their activity, in other words those whose duties require their part-time presence on shipboard (as there would be no coverage under the old Act for purely landbased workers). But we see nothing to suggest that Congress meant, for example, to exclude from benefits a steadily employed longshoreman whose duties periodically took him aboard ship but who, at the time of injury, was engaged in moving terminal cargo shoreward of the point of rest. The fourth circuit's view would create, in effect, a further and more narrow situs requirement than that in the Act. *See* Judge Craven's dissent in *I.T.O. supra,* at 1096–97. Whether the status of at least a steady employee is that of a "maritime" worker, including "longshoreman", seems to us to require looking at the nature of his regularly assigned duties as a whole.

We would further comment that the fourth circuit view does not seem compatible with the "uniformity" of coverage Congress was seeking. The evil of the old Act was that it bifurcated coverage for essentially the same employment. The point of rest approach would seem to result in the same sort of bifurcation, since the same employee engaged in an activity beyond point of rest would cease to be covered. This is not to say that Congress might not

have focused the generous benefits of the Act on direct loading and unloading activities to the exclusion of others. These are at the heart of the longshoreman's traditional work and may be more dangerous.[9] But Congress expressly included "terminal" in the situs provisions of the Act, and we think that if a bifurcation of this sort were intended, the Act, or at least the legislative history, would have pointed to it explicitly. We therefore reject the fourth circuit's point of rest analysis.

We are more persuaded by the reasoning of the second circuit in *Pittston,* which held as follows:

"We therefore hold that the [1972] Amendments at least cover all persons meeting the situs requirements (1) who are engaged in stripping or stuffing containers or (2) are engaged in the handling of cargo up to the point where the consignee had actually begun its movement from the pier (or in the case of loading, from the time when the consignee had stopped his vehicle at the pier), provided in the latter instances that the employee has spent a significant part of his time in the typical longshoring activity of taking cargo on or off a vessel."

Slip op. at 4719. In order to arrive at (1), the *Pittston* court laid heavy stress on the specific mention in the committee reports of "the advent of modern cargo-handling techniques, such as containerization" and on the committees' recognition that this caused more of the longshoreman's work to be performed on land. It also noted the committees' sanction for coverage of "checkers" (who check the contents of containers against bills of lading) without limitation as to where the checking would be done. The court said,

"Stripping a container of goods destined to different consignees is the functional equivalent of sorting cargo discharged

---

9. There is no distinction made in the committee reports based on the dangerousness of the work performed. The reports do reflect a belief that state workmen's compensation payments are typically inadequate—not just, it seems, for longshoremen but for workers generally. In the sense that the 1972 Amendments are intended to provide a more adequate level of coverage, they are "remedial" and entitled, like the Act originally, to be "liberally" construed in conformance with its purpose . . . ." *Voris v. Eikel,* 346 U.S. 328, 333, 74 S.Ct. 88, 92, 98 L.Ed. 5 (1953).

from a ship; stuffing a container is part of the loading of the ship . . . . Congress intended to cover men engaged in these activities if they met the situs test contained in the Act—irrespective of the employee's position vis-a-vis a 'point of rest.' . . . One answer to petitioners' argument that stuffing or stripping a container on a pier is no different from doing the same job a mile away is that Congress may have doubted its power, under the admiralty clause of Article III, to go further than it did. . . . We fail to perceive any significant difference because, for the convenience of someone, it [the container] had been moved to another pier. The cargo had not yet been delivered to the consignee; the unloading process still had not been completed." [Footnote deleted.]

Slip op. at 4714.

Except in one respect, discussed later, we find Judge Friendly's analysis with respect to handling the contents of containers not only persuasive but compelling. The historical work of longshoremen was said to be, "in connection with unloading cargo, the breaking up of drafts and pallets, sorting the cargo according to its consignees and delivering it to the trucks or other carriers." *Intercontinental Container Transport Corp. v. New York Shipping Ass'n*, 426 F.2d 884, 886 (2d Cir. 1970). This conforms to the usual obligation of the ship "[t]o unload the cargo onto a dock, segregate it by bill of lading and count, put it at a place of rest on the pier so that it is accessible to the consignee, and afford the consignee a reasonable opportunity to come and get it." *American Presidential Lines, Ltd. v. Federal Maritime Board*, 115 U.S.App.D.C. 187, 317 F.2d 887, 888 (1962).

■ If a container is discharged from a vessel containing goods for a number of consignees neither the shipowner nor the longshoremen will have completed their work until the container is stripped and the cargo sorted so as to be accessible to the consignees. We agree with Judge Friendly that it can make little difference with respect to the longshoreman's activity whether the stripping and sorting is done where the container first comes to rest on the pier or shoreward of that point. If there is a relevant difference, Congress has not mentioned it. The committees do emphasize that coverage is not intended for employees "who are not engaged in loading [or] unloading . . . a vessel"; but it seems both reasonable and consistent with existing practice, to view the unloading process as not yet complete so long as unsorted goods destined for various consignees remain inside the original container within which they were shipped, even though the containers have already been removed from the hold of the vessel. On this premise, one stripping a container retains the status of a "longshoreman" and is "engaged in longshoring operations".

■ The most troublesome question, as we see it, is reconciling this view with the statement in the committee reports that the compensation system of the Act is to apply to employees who would otherwise be covered for part of their activity. That statement, as well as other parts of the committee reports, indicates that Congress, in moving shoreward, did not see itself as including under the Act whole new groups and classes of employees. Coverage was still to be geared only to persons who loaded and unloaded vessels (or else repaired or built them) and who fit such traditional maritime designations as longshoreman, harborworker, and the like. Thus, as indicated previously, we quite agree with the second circuit that clerks and other like terminal workers are excluded.

The problem is whether those performing longshoring operations, like Stockman, are also to be excluded unless they can demonstrate that part of their normal duties requires them to go aboard a ship—or, as Judge Friendly said (with respect to "cargo handlers", but not strippers or stuffers), unless "the employee has spent a significant part of his time in the typical longshoring activity of taking cargo on or off a vessel". *Pittston, supra,* at 4719.

■ We conclude, however, in accord with the second circuit, that there is no

need for such a showing in the case of persons employed, like Stockman, in the stripping of containers containing unsorted cargo, destined for several consignees, at a location within the situs requirement. Such an individual, like a longshoreman working on the pier alongside a ship during unloading operations, is a longshoreman within § 902(3). Whatever the language of the committee reports, the statute itself calls for no additional showing once that status has been firmly established. It is clear, as indeed Judge Winter recognizes, *I.T.O., supra*, at 1088, that even longshoring work in its traditional form is at times organized so that some workers remain at all times on the pier as part of a continuous loading or unloading process. *See Garrett v. Gutzeit O/Y*, 491 F.2d 228 (4th Cir. 1974). Plainly such men are no less longshoremen than their brethren on the vessel. While Congress did not mean in the 1972 amendments to cover new classes of employees not heretofore covered in part, we do not believe it meant to exclude from coverage those particular members of a covered group, e. g. longshoremen, whose individual duties do not happen to take them on shipboard. We read the language of the committee reports as requiring bona fide membership in a class of employees whose members would for the most part have been covered some of the time under the earlier Act—not necessarily a demonstration by each claimant that he individually would have been covered.

This is not to say that workers who are not plainly longshoremen, or otherwise plainly included in some recognized category of maritime employment, may not have to demonstrate their entitlement to coverage by showing that their duties encompass shipboard activity. Something like this thinking doubtless accounts for clause (2) of the second circuit's formulation, relating to "cargo handlers" as distinct from those stuffing or stripping containers. We expressly do not decide this matter now, since it is not before us. We hold only that an employee like Stockman, being a longshoreman and engaging in longshoring operations, comes within the status requirement of the Act.

*Affirmed.   Costs for appellees.*