**PROLERIZED NEW ENGLAND COMPANY, Employer-Petitioner,**

and

**Hartford Accident and Indemnity Company, Carrier-Petitioner,**

v.

**BENEFITS REVIEW BOARD, United States Department of Labor, Respondent.**

**Director, Office of Workers' Compensation Programs, United States Department of Labor, Respondent,**

and

**Richard F. McNeil, Claimant-Respondent.**

**No. 80–1086.**

United States Court of Appeals, First Circuit.

Argued Sept. 4, 1980.

Decided Dec. 23, 1980.

---

32

David M. Mandel, New York City, with whom Richard P. Ward, Boston, Mass., Ropes & Gray, Timothy F. Nevils, and Sullivan & Cronin, Boston, Mass., were on joint brief, for petitioners.

Mark C. Walters, Atty., U. S. Dept. of Labor, Washington, D. C., with whom Carin Ann Clauss, Sol. of Labor, Laurie M. Streeter, Associate Sol. and Gilbert T. Renaut, Atty., U. S. Dept. of Labor, Washington, D. C., were on brief, for Federal respondent.

David M. Wright, Jacob M. Atwood, and Atwood & Wright, Boston, Mass., on brief for claimant-respondent, Richard F. McNeil.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, WYZANSKI, Senior District Judge.*

COFFIN, Chief Judge.

Prolerized New England Company and its compensation carrier petition for review of a decision of the Benefits Review Board, awarding claimant Richard F. McNeil disability benefits under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–50 (LHWCA or the Act). McNeil became totally disabled as a result of injuries suffered in a fall while employed at Prolerized. The Board based its award on the necessary twin findings that McNeil was engaged in "maritime employment" and that the situs of his injury was an area adjoining navigable waters used in loading vessels. Petitioners contest the award, arguing that McNeil failed to satisfy either branch of the Act's dual status-situs test of coverage, and object to the Board's assessment of a penalty against Prolerized under § 14(e) of the Act.

*Facts and Prior Proceedings*

Prolerized operates a scrap metal business in Everett, Massachusetts alongside the Mystic River. The facility has its own shiploading equipment and dock from which Prolerized workers load the great bulk of the company's product onto ships. Prolerized buys scrap metal in the form of junked cars, old railroad rails and other items, and processes it in one of two ways, depending upon the type of material. Approximately 60 percent of the scrap is reprocessed in the "Prolo Mill" which separates ferrous metal from other materials such as plastic, glass

and non-ferrous metals. This unusual process, named "prolerization" after its inventor, uses a high-speed 55-ton hammer-and-wheel assembly to break up automobiles and large appliances into fist-sized chunks in a few seconds. Magnets extract the ferrous metal while other mill machinery separates and washes non-ferrous metals such as brass, aluminum and copper, and removes the residue. The incoming scrap is fed into the mill by an eight-foot wide conveyor known as the "8–Y" conveyor. The processed steel, called "prolo steel", is transported by another conveyor to stockpiles in the yard where it awaits shipment.

The other 40 percent of the scrap purchased by the company, consisting of thickness grades No. 1 and 2 steel, is not prolerized, but goes instead to the "Shear", located on Prolerized's property several hundred feet away from the Prolo Mill. Like the Prolo Mill, the Shear is a gargantuan piece of machinery, but its more simple function is to cut scrap steel into short lengths, four feet long or less. After being cut, the steel is stockpiled and eventually moved by truck to the dock where it is loaded onto ships. Almost all of the end product of both processes is shipped from the dock at the Prolerized facility.[1] Ships arrive on an average of once a month and are ordinarily loaded in two to three days.

The claimant, McNeil, had worked at Prolerized as a maintenance man for two and one half years before he was injured. The Administrative Law Judge (ALJ) found that his duties involved the maintenance and repair of "all company equipment", and that he had in fact worked on all of the equipment at the facility, including the Shear, Prolo Mill and shiploading equipment. The ALJ also found that McNeil was required "on occasion" to go aboard ship and assist directly in loading or repair loading equipment that had broken down during the loading process. More important in the ALJ's estimation, however, was his finding that McNeil was not classified

---

* Of the District of Massachusetts, sitting by designation.

1. McNeil testified without contradiction that 95% of the processed steel leaves by water.

as a "shiploader". The shiploader crew was a separate group of Prolerized employees paid at a slightly higher rate than McNeil. Their regular duties were to perform loading operations and, when not loading a ship, to maintain the loading equipment. Thus, the ALJ found that McNeil's regular duties did not require him to go aboard ship unless the shiploaders were shorthanded or some piece of loading equipment needed repair during a loading operation.

At the time of his injury, McNeil had been assigned to the night shift for "several" months. There was no ship at the Prolerized dock and had been none for at least two months. On the evening of August 21, 1975 McNeil reported for work and was assigned to replace wheels and pins on the 8–Y conveyor leading to the Prolo Mill. While working there he fell 15 feet from the apron of the conveyor to the ground, seriously injuring his shoulder, arm and hand.

Based on these facts the ALJ decided that McNeil was not engaged in "maritime employment" within the meaning of 33 U.S.C. § 902(3). He concluded that McNeil's employment at the time of his injury was completely unrelated to the loading of any vessel for two reasons. First, he viewed the Prolo Mill as a distinct manufacturing process rather than part of the overall loading operation. Since repair and maintenance of shiploading equipment was the responsibility of the shiploader crew when not loading a ship, and no ships had been loaded for two months, the ALJ determined that McNeil's maintenance duties had been confined to the manufacturing end of Prolerized's operation "for a substantial period of time" before the accident. Second, the ALJ rejected McNeil's "implicit" contention that because he had occasionally worked aboard ship, all of his activities were transformed into maritime employment. The ALJ distinguished and questioned the continued viability of an earlier Board precedent, *Shoemaker v. Schiavone & Sons, Inc.*, 2 B.R.B.S. 257 (1975), that upheld coverage for an employee injured while operating a shearer machine which, like the Prolerized Shear, cut scrap

metal destined for export. The ALJ suggested that McNeil's relation to waterborne transportation at the time of his injury was more remote than the claimant's in *Shoemaker* and that, in any event, the Board had later retreated from *Shoemaker*. Finally, without explanation, the ALJ concluded that McNeil's injury had not occurred on a covered situs as described in § 3(a) of the Act, 33 U.S.C. § 903(a).

The Board reversed the ALJ's decision as unsupported by substantial evidence and erroneous as a matter of law. The ALJ's major legal error, according to the Board, was in applying a strict "moment of injury" test which looked only to the particular task performed by the claimant at the time of injury. The moment of injury test was rejected by this court in *Stockman v. John T. Clark & Son of Boston, Inc.*, 539 F.2d 264 (1st Cir. 1976), cert. denied, 433 U.S. 908, 97 S.Ct. 2972, 53 L.Ed.2d 1092 (1977); and by the Supreme Court in *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977). The Board evaluated the ALJ's findings with regard to McNeil's duties and determined that his responsibilities were "an integral part of the loading process". Crucial to the Board's conclusion was its finding, based on McNeil's testimony, that the purpose of cutting scrap to four foot lengths in the Shear was to fit the steel into the holds of the ships. Cumulating all of McNeil's loading-related activities including actual loading, repair of loading equipment and operation and maintenance of the Shear, the Board concluded that McNeil was engaged in maritime employment when injured. In reaching this conclusion the Board expressly rejected the ALJ's reliance on McNeil's job classification as dispositive of status. The Board also reversed the ALJ's decision on situs, holding that McNeil's injury occurred in an "adjoining area customarily used by an employer in loading a vessel". Section 3(a), 33 U.S.C. § 903(a).

On remand, the ALJ entered a compensation order finding McNeil temporarily totally disabled, while protesting vehemently that his earlier ruling was correct. This appeal followed.

*Status*

33 U.S.C. § 902(3), referred to as the "status" requirement, defines the term "employee" as: "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations . . . ." Since this requirement was added to the Act in 1972 courts have struggled to interpret the phrase "maritime employment" consonant with the wisdom that "[a]ny legislative scheme that compensates workmen or their families for industrial mishaps should be capable of simple and dependable enforcement." *Davis v. Dept. of Labor*, 317 U.S. 249, 258, 63 S.Ct. 225, 230, 87 L.Ed. 246 (1942) (Frankfurter, J., concurring). *See P.C. Pfeiffer Co., Inc. v. Ford*, 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979); *Northeast Marine Terminal Co. v. Caputo, supra; Stockman v. John T. Clark & Son of Boston, Inc., supra.* This case is different from most decided under the 1972 amendments in that here at least some of the cargo destined for shipment was processed at the water's edge before shipping, adding another facet to the interface between land and sea-borne transportation. Despite this complicating factor, the Board applied conventional analysis, asking whether McNeil's responsibilities were "an integral part of the loading process". *See Ford, supra,* at 83, 100 S.Ct. at 337; *Caputo, supra,* at 271, 97 S.Ct. at 2361.

On the question of "status", petitioners' major contention is that the Board impermissibly intruded on the fact-finding province of the ALJ by determining for itself the relation of claimant's duties to the shiploading process. Petitioners urge that we defer to the ALJ's view of claimant's employment status rather than the Board's. Petitioners further contend that the ALJ properly assessed the character of claimant's duties over a "substantial period of time" prior to his injury and that the Board erred as a matter of law both in broadening the time frame for its status inquiry and in relying on mere "occasional" duties to determine status. Even if the Board's scope of inquiry was correct and occasional duties suffice, argue petitioners, claimant's main-

tenance duties were typical of the support services necessary for any land-based operation and therefore not peculiarly maritime in nature.

■ Much of petitioners' argument is based on what we conceive to be a mischaracterization of the Board's decision. The Board did not, as we read its opinion, decide that the Prolo Mill was an integral part of the loading process; rather, it distinguished the operation of the Prolo Mill and the Shear and determined only that the latter bore an integral relationship to loading. If the Board had treated the Prolo Mill as part of the loading process, there would be some force to petitioners' argument that the prolerizing operation interrupted the loading process so as to interrupt coverage under the Act. This is particularly true in light of the Board's latter adoption of that position in *Castro v. Hugo Neu-Proler Co.*, 10 B.R. B.S. 35 (1979). Inasmuch as the Board confined itself to the Shear in this case, however, its opinion is entirely consistent with Board precedent. *See Shoemaker v. Schiavone & Sons, Inc., supra.*

■ Turning to the complaint that the Board impermissibly engaged in factfinding, we consider the most significant instance to be the Board's resort to the record to determine the function of the Shear. The Board found that the Shear's function was to facilitate shiploading based on the claimant's testimony alone; the ALJ made no such finding. In its review of the ALJ's findings the Board is more restricted than other similar entites such as the National Labor Relations Board. It is bound to uphold the ALJ's findings if supported by substantial evidence. Section 921(b)(3). It may not engage in de novo review and substitute its findings for the ALJ's. *Presley v. Tinsley Maintenance Service*, 529 F.2d 433, 436 (5th Cir. 1976). Our review of the Board's decision is in turn limited to "errors of law, including . . . whether the Board adhered to the substantial evidence standard in its review of factual findings" by the ALJ. *Bath Iron Works Corp. v. White*, 584 F.2d 569, 574 (1st Cir. 1978). Thus,

under the LHWCA, when the Board and ALJ disagree on factual matters, we owe deference to the ALJ; under the National Labor Relations Act by contrast, we defer to the Labor Board. *See Avondale Shipyards, Inc. v. Vinson*, 623 F.2d 1117, 1119 n. 1 (5th Cir. 1980); *Air America, Inc. v. Director, OWCP*, 597 F.2d 773, 780 (1st Cir. 1979).

■ Despite the Board's restricted fact-finding authority, we conclude for several reasons that its foray into the record was justified in this case. First, claimant's testimony on the function of the Shear was uncontested. Petitioners failed to put on any evidence concerning the nature of the operations at Prolerized, despite the invitation of the ALJ to do so. Second, the ALJ did not discredit this or any other portion of claimant's testimony, nor did he make any contrary finding with respect to the Shear's function. Instead, the ALJ chose to ignore the Shear, which accounted for 40 percent of Prolerized's operation. Thus, the Board's finding does not conflict with the facts as found by the ALJ. Third, in questioning and attempting to distinguish *Shoemaker* the ALJ significantly failed to assert that the Prolerized Shear differed from the shearer machine held in *Shoemaker* to be part of the loading process. Under these circumstances, the Board was justified in concluding without a remand that the record would only support a finding that the Shear's function was to cut steel to fit into the holds of ships.

■ Petitioners further contend that the characterization of the Shear's function as "integral" to the loading process was a factual finding committed to the ALJ. We disagree. Framing the scope of the loading process for the purpose of delineating the coverage of the Act is primarily a matter of policy. Although the inquiry may be fact-sensitive, the historical facts in this case are not disputed. Deciding the impact of the various types of maritime business organization on the coverage provisions of the Act must inevitably be informed by Congress' intent to apply "a simple, uniform standard of coverage." *Ford, supra*, 444 U.S. at 83,

100 S.Ct. at 337. Neither we nor the Board owes special deference to the ALJ on such issues of statutory policy.

■ We also think that the Board's determination that the Shear was an integral part of the loading process was in accordance with law. This question turns on whether the Shear is properly viewed as a separate operation or as part of an integrated loading process. Formulating a standard to distinguish preparation for shipment from manufacture is not appreciably aided by reference to the case law. *Cf. Weyerhauser Co. v. Gilmore*, 528 F.2d 957, 961 (9th Cir.), *cert. denied*, 429 U.S. 868, 97 S.Ct. 179, 50 L.Ed.2d 148 (1976) ("realistically significant relationship" to maritime activity). Approaching the question as one of first impression, we think the Prolerized operation offers as good an illustration as one is likely to find of where the line should be drawn. The Prolo Mill actually changes the composition of scrap metal by separating it into component parts. Like a manufacturing process, it creates from raw material a recognizably different product. The Shear, on the other hand, merely changes the shape of scrap steel to prepare it for shipment. The steel is the same before and after, only its size has changed. On this record we think the Board was plainly within its bounds in concluding that the Shear was an integral part of the loading operation. We are unimpressed with petitioners' argument that shortening steel also facilitates land transportation. The same can be said for cargo containers. The fact remains that in the normal course of operations the steel arrived by land and, after shearing, most, if not all, left by sea.

The Supreme Court in *Caputo* and *Ford* did not restrict "longshoring operations" to the actual carriage of cargo but applied a far more inclusive standard, asking whether the claimant was "engaged in intermediate steps of moving cargo between ship and land transportation." 444 U.S. at 83, 100 S.Ct. at 337 (footnote omitted). The Court stressed in *Ford* that participation in any phase of the intermodal transfer of cargo was sufficient to establish status. "A

worker responsible for some portion of that activity is as much an integral part of the process of loading or unloading a ship as a person who participates in the entire process." *Id.*, at 82–83, 100 S.Ct. at 337. Viewed in terms of this functional analysis we are satisfied that the Shear was an intermediate and necessary step in the process of moving cargo from the land transportation on which it arrived to the ships on which it left. We see no principled basis for distinguishing McNeil's responsibilities from those of a worker like claimant Blundo in *Caputo* who checked and marked items of cargo as they were removed on shore from a cargo container. Blundo's activities followed, while McNeil's preceded, the process of preparing goods for shipment; one is merely the converse of the other. Once we regard shearing as the functional equivalent of packaging, we cannot exclude it from the larger loading process without erecting an untenable distinction between packing and unpacking.

This case is made considerably easier by the fact that the Shear is a physically distinct part of the employer's operation whose sole function is to prepare goods for shipment. More difficult problems of line-drawing would be presented if such a packing phase were physically and functionally integrated into a shoreside manufacturing process, making it necessary to divide a continuous manufacturing-shipment continuum into its component processes. We need not formulate a rule to accommodate such a situation, however, since in this case we decide that the Shear is entirely distinct from manufacturing.

Our conclusion that the Shear was integral to the loading process blunts the force of petitioners' other principal line of attack aimed at the Board's supposed reliance on McNeil's "occasional" longshoring duties. The ALJ found that McNeil "on occasion" boarded ships to assist in positioning a collar and chute over the hold prior to loading, manned lines on the dock, and went aboard ship to repair loading equipment. To these two types of conventional longshoring activities—actual loading and repair of loading equipment—the Board added a third: maintenance and operation of the Shear. As noted, the ALJ failed to focus on the Shear, but he did find that McNeil worked on all of Prolerized's equipment including the Shear, and that the Shear accounted for 40 percent of the total operation. The ALJ also found that one of McNeil's regular duties at the time he was injured was to change filters on the Shear every Saturday morning.[2]

Taking these duties together, we think a substantial portion of McNeil's duties involved longshoring activity. In contrast to the diminution in McNeil's conventional longshoring activities found by the ALJ, there was no evidence that his duties with respect to the Shear were reduced in the weeks and months preceding his accident. To the contrary, McNeil testified without contradiction or challenge that before his accident "[t]he Shear was one of the main functions I was involved with because vacations were coming up in the summertime." Accordingly, we need not decide whether the ALJ used the proper time frame in assessing McNeil's non-Shear-related duties.

■ We reject petitioners' final argument that McNeil was not engaged in "maritime employment" because he principally repaired and maintained equipment rather than operated it. It is true that support services equally suited to land-based enterprises, such as office clerical work, do not qualify as maritime employment. *Maher Terminals, Inc. v. Farrell*, 548 F.2d 476, 476 (3d Cir. 1977). But we think that McNeil's repair, maintenance and occasional operation of the varied elements of Prolerized's integrated loading system qualify as peculiarly maritime services. As McNeil was directly involved in the movement of marine cargo, he falls within the

---

**2.** When asked to describe the work he performed on the Shear McNeil replied:

"Everything, from maintenance to cutting of the steel to running the operation, to pulling the maintenance when it broke down, what had to be done."

broad concept of maritime employment. *See, e. g., Newport News Shipbuilding & Dry Dock Co. v. Graham*, 573 F.2d 167, 169–70 (4th Cir.), *cert. denied*, 439 U.S. 979, 99 S.Ct. 563, 58 L.Ed.2d 649 (1978); *Vinciquerra v. Transocean Gateway Corp.*, 1 B.R. B.S. 523 (1975). The ALJ was not bound to disregard McNeil's repair and operation of the shoreside shiploading equipment merely because he was not a member of the crew to which the employer assigned primary responsibility for those tasks. The Board properly looked beyond McNeil's job classification to evaluate the *actual* nature of his regularly assigned duties as a whole. *See Stockman, supra*, 539 F.2d at 275. Adhering to the employer's formal designation of duties, as did the ALJ, would allow an employer to manipulate LHWCA coverage by regularly assigning too few "longshoremen" for the job, thus requiring extra help as a matter of practice. Permitting coverage to fluctuate in this fashion would conflict with the intent of Congress that coverage should follow the occupation of the worker and not the employer's assignment policies. *Ford, supra*, at 83, 100 S.Ct. at 337; *Odom Construction Co., Inc. v. United States Department of Labor*, 622 F.2d 110, 113 (5th Cir. 1980).

■ We therefore conclude that there is substantial evidence on the record as a whole to support the Board's conclusion that when injured McNeil was engaged in maritime employment. This conclusion is confirmed by the employer's failure to controvert McNeil's testimony as to his duties and the function of the Shear. Such matters are presumptively within the employer's knowledge. Even if the status issue were close, doubtful questions should be resolved in favor of the injured employee in order to place the burden of possible error on the employer who is better able to avoid the error and bear the loss. *Bath Iron Works Corp. v. White, supra*, 584 F.2d at 574.[3]

*Situs*

McNeil fell from the 8–Y conveyor leading to the Prolo Mill, approximately 1000 feet from the water's edge. To receive compensation, he must have been injured "upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading . . . a vessel." 33 U.S.C. § 903(a). The Board held that McNeil was injured on a covered situs, reasoning that: "Claimant's injury was sustained at a site immediately next to the mill and near the dock and loading facilities adjacent to the Mystic River. It follows that claimant was injured on an adjoining area customarily used by an employer in loading a vessel."

■ This analysis leaves much to be desired. Plainly, the site of the injury must adjoin navigable waters, not a loading area as the Board would seem to have it. *Stockman, supra*, 539 F.2d at 272. The situs requirement is not satisfied merely because the injury occurred "near" a covered area. Even if "near" were enough, it is questionable that the Board could be sustained on its analysis since McNeil was injured several hundred yards away from the dock, and the 8–Y conveyor from which he fell, viewed functionally, was far removed from the loading of ships.

■ While we find the Board's approach inadequate, considerations of policy never-

---

3. Since we view McNeil's duties as substantially maritime in nature we do not reach the Director's contention that the "occasional" longshoring duties found by the ALJ would suffice to establish status. We do note, however, that the ALJ's characterization of McNeil's indisputably longshoring activities as "occasional" appears to have been unwarranted. McNeil testified to extensive maritime work including totally refurbishing a dockside gantry and frequent major repairs on the shiploader conveyor when it broke down during loading. The ALJ did not discredit McNeil but inexplicably diminished his duties as "occasional". Some clue to the meaning of "occasional" may be found in the ALJ's observation that McNeil's "regular duties did not involve going aboard ship unless some problem arose requiring the repair of equipment . . . ." We take this to mean that a repairman generally is not called until something needs fixing.

theless lead us to uphold its decision. *Caputo* made clear that a covered "adjoining area" need not be entirely devoted to ship-loading. Assuming that the statutory phrase "customarily used . . . in loading" modifies "terminal" as well as "adjoining area", the Court held an entire terminal facility covered when one of its two finger-piers was used to load and unload vessels. *Caputo, supra*, 432 U.S. at 281, 97 S.Ct. at 2366. A similarly expansive construction of "adjoining area" is necessary in this case to avoid resurrecting the evil of shifting coverage that Congress sought to avoid in the 1972 amendments. A crazy quilt pattern of situs coverage tracking the indistinct line between Prolerized's manufacturing and loading operations would produce uncertainty and confusion for employer and employees alike. We therefore conclude that McNeil's injury in an adjoining area used for both loading and manufacturing met the situs requirement.

*Section 14(e) Penalty*

Since Prolerized had failed to pay benefits or file a notice of controversion within fourteen days after having knowledge of his injury, claimant sought a 10 percent penalty on the benefits not timely paid pursuant to § 14(e) of the Act, 33 U.S.C. § 914(e).[4] While recognizing that Prolerized had not complied with § 14(e)'s literal terms, the ALJ nevertheless refused to impose the penalty on the ground that Prolerized had no knowledge that McNeil would claim LHWCA benefits at the time of his injury. On appeal by Prolerized and its carrier, the Board noticed the penalty issue sua sponte over a dissent and reversed the ALJ's determination, holding that the penalty was mandatory and could not be waived by the claimant.

Petitioners object that the Board unfairly deprived them of an opportunity to be heard and misconstrued § 14(e). The first objection is potentially troubling. Given the public interest in prompt voluntary payment of LHWCA benefits furthered by § 14(e), the Board had discretion to raise the issue on its own motion. But the exercise of this supervisory authority does not require ambushing litigants. If the penalty were indeed mandatory, notice would be of little use, but § 14(e) by its terms excuses payment of the penalty when an employer could not timely pay compensation "owing to conditions over which he had no control . . . ." Petitioners were at least entitled to an opportunity to make that showing. Their challenge to the Board's decision on this ground fails, however, because notwithstanding the lack of notice, the record reveals that petitioners took nothing for granted and vigorously defended the ALJ's penalty ruling before the Board.

Petitioners admit that they learned of McNeil's injury immediately but argue that the 14-day period referred to in § 14(e) should have been tolled until they reasonably should have known that the employee would claim compensation. Petitioners rely on McNeil's resort to the Massachusetts Workers' Compensation Act for this and prior injuries as evidence that they should not be held to have anticipated a LHWCA claim.

The Board rejected this argument, holding that the fourteen day period runs from the date of the employer's knowledge

4. Section 14(e) provides:
   "If any installment of compensation payable without an award is not paid within fourteen days after it becomes due, as provided in subdivision (b) of this section, there shall be added to such unpaid installment an amount equal to 10 per centum thereof, which shall be paid at the same time as, but in addition to, such installment, unless notice is filed under subdivision (d) of this section or unless such nonpayment is excused by the deputy commissioner after a showing by the employer that owing to conditions over which he had no control such installment could not be paid within the period prescribed for the payment."
   Section 14(b) provides that
   "[t]he first installment of compensation shall become due on the fourteenth day after the employer has knowledge of the injury or death . . . ."
   Section 14(d) provides, in virtually identical language, that the employer must file notice of controversion "on or before the fourteenth day after he has knowledge of the alleged injury or death . . . ."

of injury or death. We cannot say that this literal interpretation of the language of § 14(b) and (d), *see* note 4, *supra*, is unreasonable or unfair where the employer has knowledge of a work-related injury but thinks LHWCA coverage is far-fetched.[5] To avoid a penalty the employer need only file a notice of controversion or, if he admits coverage, pay benefits. Tying the 14-day period to the existence of a reasonable doubt of coverage would import consideration of the merits into what should be a routine ministerial determination.

Section 14(e) provides its own escape hatch when the employer has failed to make payments "owing to conditions over which he had no control ...." The showing in this case falls far short of that standard. Petitioners filed their notice only six days later, 20 days after the accident and several months before McNeil applied for federal benefits. We are left to wonder what occurred in those six days to alert petitioners to the possibility of a federal claim. Concurrent state and federal jurisdiction over shoreside injuries is well settled. *See Sun Ship, Inc. v. Commonwealth of Pennsylvania*, 447 U.S. 715, 100 S.Ct. 2432, 65 L.Ed.2d 458 (1980). Thus, McNeil's application for state benefits in no way precluded a later federal claim and, as we have noted, the Board had allowed coverage for a worker with responsibilities similar to McNeil's in *Shoemaker, supra*, two years before the accident in this case. We will not disturb the Board's imposition of a penalty.

*The Benefits Review Board as Respondent*

■ The Director has moved to dismiss the Benefits Review Board on the ground that the Board is not a proper party respondent to a review proceeding under 33 U.S.C. § 921(c). We are aware that several of our sister circuits have granted similar motions. *See Nacirema Operating Co., Inc. v. Bene-*

*fits Review Board*, 538 F.2d 73, 75 (3d Cir. 1976); *I.T.O. Corp. of Baltimore v. Benefits Review Board*, 529 F.2d 1080, 1088–89 (4th Cir. 1975), *modified en banc on other grounds*, 542 F.2d 903 (1976), *vacated and remanded on other grounds*, 433 U.S. 904, 97 S.Ct. 2972, *on remand*, 563 F.2d 646 (1977); *Offshore Food Services, Inc. v. Benefits Review Board*, 524 F.2d 967 (5th Cir. 1975); *McCord v. Benefits Review Board*, 514 F.2d 198, 200–01 (D.C.Cir.1975) (per curiam). Though we might well join these decisions, we decline to do so at this time. However anomalous it may seem to require an ajudicative body such as the Board to defend its decision on appeal, Fed.R.App.P. 15(a) requires that in "each" case where a party seeks review of an administrative order, "the agency shall be named respondent." "Agency" is defined in the rule to include "board, commission or officer". Moreover, the idea that the Board would appear in review proceedings under § 921 evidently was not wholly foreign to Congress, since at the same time it created the Board, Congress amended § 921a to provide that "[a]ttorneys appointed by the Secretary shall represent the Secretary, the deputy commissioner, or the Board in any proceeding under § 21 [33 U.S.C. § 921]." *See Pittston Stevedoring Corp. v. Dellaventura*, 544 F.2d 35, 43 n. 5 (2d Cir. 1976), *aff'd sub nom. Northeast Marine Terminals Co. v. Caputo*, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977).

While these provisions may not be dispositive, they do give us pause. We are particularly reluctant to pass on this question in view of the Director's failure to suggest any adverse consequence flowing from the Board's party status. As far as we can tell, the naming of the Board is a purely formal exercise. The Board has not filed a brief; even this motion was presented by the Director. The motion to dismiss is therefore

---

**5.** The cases cited by petitioners are not to the contrary. In *Universal Terminal & Stevedoring Corp. v. Parker*, 587 F.2d 608 (3d Cir. 1978), the employer voluntarily paid benefits while the injured employee recuperated. The court held that the employer was not required to file a notice of controversion on the claimant's return to work in order to avoid a penalty in the event that he later proved to have a permanent impairment. The dictum in *Strachan Shipping Co. v. Davis*, 571 F.2d 968, 974 (5th Cir. 1978) concerned the employer's lack of knowledge that an employee's lung disease was work-related.

denied without prejudice to a later effort by the Board to demonstrate that its dismissal would have some concrete significance.

*Affirmed.*

