ZEHMER, Judge.
The claimant, Chris Smart, appeals an order denying his claim for worker’s compensation benefits on the ground that his exclusive remedy is under the federal Longshoremen’s and Harbor Workers’ Compensation Act. We reverse.
On June 20, 1978, three weeks after being employed by Marathon Seafood to work as a helper in Marathon’s shrimp processing and packing house, claimant was engaged in packing shrimp when he experienced sharp pains described as being like electric shocks running down both legs. He sought medical attention for this injury *49 and filed a worker’s compensation claim under chapter 440, Florida Statutes. Marathon had worker’s compensation coverage with American Casualty Company as part of its employer’s liability insurance policy, in which Marathon’s business classification for premium purposes was listed as “wholesale fish dealer.”
The carrier denied the claim on the ground, among others, that the deputy commissioner lacked jurisdiction under section 440.09(2), Florida Statutes (1977)[1] because the claimant’s injury was covered by the federal Longshoremen’s and Harbor Workers’ Compensation Act, 38 U.S.C., §§ 901, et seq. Both the employer, Marathon, and the claimant contended the deputy had jurisdiction under chapter 440 because claimant was essentially engaged in a manufacturing or processing business that took place on land and that he was not a “maritime employee” covered by the federal act. After hearing substantial evidence on this jurisdictional issue, the deputy commissioner held that the claimant’s injury was covered by the federal act and dismissed the claim.
At the time of claimant’s injury, Marathon Seafood was in the business of purchasing and processing shrimp, lobster, and other kinds of seafood at its processing facility and selling the processed seafood at wholesale. Marathon owned and maintained a dock adjacent to its plant and purchased shrimp directly from independently owned and operated boats (eighteen tons and over) at its dock. The shrimp boats were unloaded by an employee of Marathon (other than claimant) by use of a winch which would lower a bucket to the hold of the boat, where it would be filled by the boat crew. The bucket would then be hoisted and the shrimp transferred directly to a holding tank attached to the processing building. Once deposited in the bank, Marathon became owner of the shrimp, which it would then process and sell at wholesale.
The processing would begin when the shrimp were placed in the holding tank containing a washing solution and preservative. Upon transfer from that tank, the heads would be removed by a crew of workmen (not the claimant) and the shrimp would be placed in a second tank to again be washed and treated with a preservative. The shrimp would next be placed in a grading machine which separated them according to size. The sorted shrimp would then be weighed and packed with ice in large boxes. The boxes would be removed to a refrigerated cooling room and stored until resold to Marathon’s customers and loaded on trucks for delivery. Two or three times a week, Marathon’s customers typically would take delivery at Marathon’s plant, using their own trucks or trucks operated by another shrimp wholesaler.
Claimant’s employment primarily involved processing the shrimp after grading by weighing the sorted shrimp, packing them in ice, and moving the boxes to the cooler. Claimant was required to lift plastic bags of sorted shrimp weighing forty to seventy pounds approximately thirty inches onto a scale, add enough shrimp to total 105 pounds, pack these shrimp in ice, and move the boxes by dragging or lifting them to the cooler. Claimant also assisted in loading the customers’ trucks on occasion. Other miscellaneous jobs occasionally performed by claimant when he was not packing shrimp included lubricating machinery in the plant and the winch at the dock, pulling weeds, mowing, painting, and cleanup. Claimant, however, was not hired for, and in fact never engaged in, the unloading of shrimp from the shrimp boats to the holding tank.
The deputy commissioner personally observed the premises and described them in her order:
As evidenced by the photographs in evidence, the entire premises are moderately sized. From the dock where the boats are unloaded to the inside of the process *50 ing house itself where the heading, grading, weighing and packing is done, there is a distance of at most 20 to 25 feet approximately. Thus, the entire shrimp processing operation from unloading to ice storing, to finally re-loading on the trucks, takes place in a fairly self-contained and moderately sized area. Once the shrimp are unloaded directly from the boats, the balance of the MARATHON SEAFOOD operation (including the heading, grading, weighing, packing, and finally storing in ice) takes place inside the processing house where the machines are located approximately 25 feet off the dock.
The deputy commissioner concluded from these facts that claimant met both prongs of the situs and status test for determining coverage under the longshoremen’s act, as delineated by the Supreme Court in P.C. Pfeiffer Co. v. Ford, 444 U.S. 69, 73-74, 100 S.Ct. 328, 332, 62 L.Ed.2d 225 (1979):
The ... situs test provides compensation for an “employee” whose disability or death “results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).” § 3(a), 33 U.S.C. § 903(a). The status test defines an employee as “any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker....” § 2(3), 33 U.S.C. § 902(3). To be eligible for compensation, a person must be an employee as defined by § 2(3) who sustains injury on the situs defined by § 3(a).
We agree with the deputy commissioner that the situs prong of the test is met in this case. The processing and storage facility and dock were joined as an integral facility. Both were adjacent to navigable waters. The dock handled the unloading of shrimp boats weighing over eighteen tons. Claimant’s alleged injury occurred on a “contiguous dock area related to longshore ... work.” P.C. Pfeiffer Co., supra, 444 U.S. at p. 79, n. 9, 100 S.Ct. at p. 335, n. 9.
We disagree, however, with the deputy commissioner’s conclusion that claimant also met the status prong of the coverage test. Under the statutory definition of employee in 33 U.S.C. § 902(3), only persons employed to perform longshoring operations or harbor work relating to shipbuilding or repair fall within the act’s coverage. As this case involves no question of harbor work, coverage exists only if it can be found that the claimant’s usual work activity was an integral part of some longshore activity, i.e., the unloading of shrimp boats.
In P.C. Pfeiffer Co. v. Ford, supra, ap-pellee Ford was injured while working on a public dock in the Port of Beaumont, Texas, securing vehicles on railroad flat ears after removal from the ship for further shipment to their ultimate destination. Ap-pellee Bryant was injured while unloading a bale of cotton from a dray wagon into a pier warehouse to await further movement from the warehouse to the ship. Regarding the purpose of the 1972 amendment to the longshoremen’s act expanding coverage to certain land-based injuries, the Supreme Court observed:
The discussion of coverage in the legislative history also shows that Congress intended the term ‘maritime employment’ to refer to status rather than situs. Committees in both Houses of Congress recognized:
‘[T]o take a typical example, cargo, whether in break bulk or containerized form, is typically unloaded from the ship and immediately transported to a storage or holding area on the pier, wharf, or terminal adjoining navigable waters. The employees who perform this work would be covered under the bill for injuries sustained by them over the navigable waters or on the adjoining land area. The Committee does not intend to cover employees who are not engaged in loading, unloading, repairing, or building a *51 vessel, just because they are injured in an area adjoining navigable waters used for such activity. Thus, employees whose responsibility is only to pick up stored cargo for further trans-shipment would not be covered, nor would purely clerical employees whose jobs do not require them to participate in the loading or unloading of cargo.’ 444 U.S. at pp. 79-80, 100 S.Ct. at pp. 335-336.
The Supreme Court affirmed coverage of both appellees’ injuries under the act, holding:
We believe that § 2(3)’s explicit use of the terms “longshoreman” and “other person engaged in longshoring operations” to describe persons engaged in maritime employment demonstrates that workers doing tasks traditionally performed by longshoremen are within the purview of the 1972 Act_the crucial factor is the nature of the activity to which a worker may be assigned. Persons moving cargo directly from ship to land transportation are engaged in maritime employment. [Northeast Marine Terminal Co. v. Caputo ], Id., [432 U.S. 249] at 267, n. 28, 97 S.Ct. 2348 [at 2359, n. 28, 53 L.Ed.2d 320]. A worker responsible for some portion of that activity is as much an integral part of the process of loading or unloading a ship as a person who participates in the entire process. We therefore hold that Ford and Bryant were engaged in maritime employment because they were engaged in intermediate steps of moving cargo between ship and land transportation. 444 U.S. at 82-83, 100 S.Ct. at 337.
In conclusion, the Supreme Court declared that its decision “does not extend coverage to all workers in the situs area” and that “a definition of maritime employment that reaches any worker who moves cargo between ship and inland transportation will enable both workers and employers to predict with reasonable assurance who on the situs is protected by the 1972 Act.” Id., at 83-84, 100 S.Ct. at 337-338.
We agree with claimant’s contention that he was not a maritime employee under the Supreme Court’s definition because he was not engaged in moving cargo “directly from ship to land transportation” or “a worker responsible for some portion of that activity.” P.C. Pfeiffer Co., supra, 444 U.S. at 82-83, 100 S.Ct. at 337. Claimant never unloaded the shrimp boats. His primary duty was to process shrimp which had been purchased by Marathon for resale to its customers. That shrimp had been unloaded by other Marathon employees whose status under the longshoremen’s act is not at issue here. Unlike the cases cited and relied on by the carrier and the deputy commissioner,[2] Marathon’s business was *52 not primarily a traditional longshore operation that involves the movement of cargo from ship to a warehouse or holding point for further transportation by land to the ultimate consigned destination or consignee. On the contrary, the shrimp unloaded at Marathon’s dock was not consigned for ultimate delivery to any person or entity other than Marathon. When the shrimp was unloaded from the boat into Marathon’s holding tank, it had reached its ultimate consigned destination insofar as maritime transportation was concerned. Any activity that might be characterized as longshoremen work ended at that point.
There would be no question that this is so had Marathon received the shrimp at its plant adjacent to the dock for cooking or canning and packaging for sale and shipment to its customers. We can see no valid reason to reach a different result simply because the processing in this case involved only removing the shrimp heads and cleaning, preserving and packing the fresh shrimp in ice for storage and sale to customers. To hold otherwise might well amount to placing all workers in fish packing or canning operations adjoining navigable waters under the longshoremen’s act. We do not believe such a construction of the act is within the congressional intent nor required by the Supreme Court’s decisions in P.C. Pfeiffer Co., supra, and Northeast Marine Terminal Co. v. Caputo, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977).
.Nor are we persuaded by the carrier’s arguments that claimant was a maritime employee because he occasionally lubricated the unloading winch and other equipment on the dock and occasionally cleaned the dock area when not busy with his primary duties of weighing and packing shrimp. To permit such occasional incidental duties to govern claimant’s status as a maritime employee would, in our opinion, permit workers to “walk in and walk out of coverage,” a special concern of Congress underlying the 1972 amendments, P.C. Pfeiffer Co., supra, 444 U.S. at p. 83, n. 18, 100 S.Ct. at p. 337, n. 18, or permit coverage to “shift with the employer’s whim.” Id., at 83-84, 100 S.Ct. at 337-338. We conclude that the longshoremen’s act covers an employee only if a significant portion of his regularly assigned duties requires that he perform work related to traditional longshoremen operations or harbor work.
REVERSED and REMANDED.
ROBERT P. SMITH, Jr. and WENT-WORTH, JJ., concur.

. Section 440.09(2) provides:
No compensation shall be payable in respect of the disability or death of any employee covered by the Federal Employer’s Liability Act, the Longshoremen's and Harbor Worker’s Compensation Act, or the Jones Act.

. Those decisions involved employees of a typical longshoremen's operation whose function was to prepare goods for shipment, hold or load and unload cargo on and off ships that was consigned to persons or ultimate destinations beyond a plant or processing facility located at dockside, or otherwise involved typical harbor worker’s employment related to the construction or repair of ships; e.g., Northeast Marine Terminal Co. v. Caputo, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977) ("checker” working at pier checking and marking cargo unloaded from vessel and terminal laborer at pier rolling dolly loaded with ship’s cargo into consignee’s truck); Prolerized New England Co. v. Benefits Review Board, 637 F.2d 30 (1st Cir.1980) (employee maintained and repaired shear and other equipment used in preparing metal for shipment on vessels — "We are satisfied that the shear was an intermediate and necessary step in the process of moving cargo from the land transportation on which it arrived to the ships on which it left.” 637 F.2d at 37.); Graziano v. General Dynamics Corp., 663 F.2d 340 (1st Cir.1981) (mason repairing shipyard buildings); Gilliam v. Wiley N. Jackson Co., 659 F.2d 54 (5th Cir.1981) (foreman supervising unloading of pilings from barge to shore); Hullinghorst Industries, Inc. v. Carroll, 650 F.2d 750 (5th Cir.1981) (carpenter engaged in construction of scaffolding beneath pier extending over river); Trotti & Thompson v. Crawford, 631 F.2d 1214 (5th Cir.1980) (carpenter engaged in construction of pier); Odom Construction Co., Inc. v. U.S. Dept. of Labor, 622 F.2d 110 (5th Cir.1980) (construction worker attempting to remove concrete blocks used for mooring barges from navigable canal); Price v. Norfolk & Western Ry. Co., 618 F.2d 1059 (4th Cir.1980) (employee painting grain loading and unloading equipment as part of routine maintenance); Newport News Shipbuilding & Dry Dock Co. v. Graham, 573 F.2d 167 (4th Cir. 1978) (employees of submarine shop and foundry working on machine used in shipbuilding); Hernandez v. Mike Cruz Machine *52 Shop, 389 So.2d 1251 (Fla. 1st DCA 1980) (employee disassembling a ship’s engine); Habrew Maritime International v. Williams, IRC Order 2-3673 (January 31, 1979) (forklift operator moving cargo from warehouse to ship).