663 F.2d 340
 Mary GRAZIANO, Widow of Charles Graziano, Deceased, Petitioner,
v.
GENERAL DYNAMICS CORPORATION, Respondent,
v.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, United
States Department of Labor, Respondent.
 No. 81-1007.
 United States Court of Appeals,
First Circuit.
 Argued June 4, 1981.
Decided Nov. 2, 1981.
 
 Lillian C. Levine, Wakefield, Mass., with whom Bernard Cohen, Inc., Brockton, Mass., was on brief, for petitioner.
 Norman P. Beane, Jr., Boston, Mass., with whom Stephen E. Laskin, and Murphy & Beane, Boston, Mass., were on brief, for respondent General Dynamics Corp., Boston, Mass.
 Janet R. Dunlop, Atty., U. S. Dept. of Labor, Washington, D. C., with whom T. Timothy Ryan, Jr., Sol. of Labor, and Laurie M. Streeter, Associate Sol., Washington, D. C., were on brief, for respondent Director, Office of Workers' Compensation Programs.
 Before CAMPBELL and BOWNES, Circuit Judges, and MAZZONE,* District Judge.
 BOWNES, Circuit Judge.
 
 
 1
 This appeal involves the combined claims of Charles Graziano, deceased, for workmen's compensation benefits and Mary Graziano, his widow, for death benefits under the Longshoremen's and Harbor Workers' Compensation Act (Act). 33 U.S.C. § 901 et seq. Mary Graziano appeals from the Decision and Order of the Benefits Review Board of the Department of Labor (Board) reversing the unpublished Decision and Order of the Administrative Law Judge (ALJ) who awarded the claimants benefits on the basis that the decedent's occupation constituted "maritime employment" within the meaning of § 2(3) of the Act, 33 U.S.C. § 902(3). It having been stipulated between the parties that the decedent met the jurisdictional situs requirement of the Act, 33 U.S.C. § 903(a), the only issue for review is whether the decedent meets the status requirement of 33 U.S.C. § 902(3), which provides:
 
 
 2
 The term "employee" means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net.
 
 
 3
 The decedent, Charles Graziano, was employed from June 3, 1964, to January 30, 1974, as a maintenance-mason at General Dynamics, a corporation engaged in the building and repairing of ships. As one of only two men classified in the Maintenance Department as a mason-laborer, Graziano's duties primarily involved the repair of masonry in shipyard buildings, but also included digging ditches, breaking up concrete with a jackhammer, laying cement, grouting, removing asbestos from pipes, repairing boilers and manholes, and cleaning acid tanks. This work was conducted throughout the shipyard, including the steel mill, turret, metal, and pipe shops, and warehouses, areas which exposed the decedent to high levels of dust and noxious fumes.
 
 
 4
 In 1972, while Graziano was hospitalized for bladder, prostate, and kidney infections, a pulmonary disease was diagnosed and linked to the poor air conditions of his employment. After his release from the hospital, Graziano returned to work on December 18, 1972. Despite the lighter workload given to him, his condition continued to deteriorate, and on January 30, 1974, he was forced to leave his job permanently. After two more hospitalizations, Graziano died in the hospital on February 12, 1976. The cause of death was given as "pneumonia" due to "chronic obstructive lung disease" of some years' duration. ALJ Decision and Order at 4. During his lifetime, Graziano filed for compensation for permanent total disability and upon his death his widow filed for death benefits.
 
 
 5
 The decision of the ALJ, finding Graziano to be an "employee" within the meaning of 33 U.S.C. § 902(3), was reversed on appeal by the Benefits Review Board. The Board concluded that the overall duties of Graziano were not essential to the shipbuilding operations of General Dynamics, although his "work in cleaning out the acid tanks and maintaining the boilers in the steel mill arguably might constitute repair of shipbuilding equipment," meriting coverage under the Act. BRB Decision and Order at 4 n.1.
 
 
 6
 "Our review of the Board's decision is limited to 'errors of law, including the question of whether the Board adhered to the substantial evidence standard in its review of factual findings' by the ALJ." General Dynamics Corp. v. Director, Office of Workers' Compensation Programs, 585 F.2d 1168, 1170 (1st Cir. 1978), quoting Bath Iron Works Corp. v. White, 584 F.2d 569, 574 (1st Cir. 1978).
 
 
 7
 The courts of appeals have wrestled with the jurisdictional status requirement since its inception as part of the 1972 Amendments to the Act.[1] "The question is made difficult by the failure of Congress to define the relevant terms-'maritime employment,' 'longshoremen,' 'longshoring operations'-in either the text of the Act or its legislative history." Northeast Marine Terminal Co., Inc. v. Caputo, 432 U.S. 249, 265, 97 S.Ct. 2348, 2358, 53 L.Ed.2d 320 (1977) (footnotes omitted).[2] The language of the 1972 Amendments, however, is broad and suggests an expansive view of coverage. "The Act must be liberally construed in conformance with its purpose, and in a way which avoids harsh and incongruous results." Id. at 268, 97 S.Ct. at 2359, quoting Voris v. Eikel, 346 U.S. 328, 333, 74 S.Ct. 88, 92, 98 L.Ed. 5 (1953). Appellate courts have stressed the wide scope of coverage which the 1972 Amendments afford. See, e. g., Warren Bros. v. Nelson, 635 F.2d 552, 556 (6th Cir. 1980); Boudloche v. Howard Trucking Co., Inc., 632 F.2d 1346, 1347 (5th Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 3049, 69 L.Ed.2d 418 (June 8, 1981); Trotti & Thompson v. Crawford, 631 F.2d 1214, 1220-21 & n.5 (5th Cir. 1980); Price v. Norfolk & Western Ry. Co., 618 F.2d 1059, 1061 (4th Cir. 1980); Newport News Shipbuilding & Dry Dock Co. v. Graham, 573 F.2d 167 (4th Cir.), cert. denied, 439 U.S. 979, 99 S.Ct. 563, 58 L.Ed.2d 649 (1978); Alabama Dry Dock & Shipbuilding Co. v. Kininess, 554 F.2d 176, 178 (5th Cir.), cert. denied, 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 190 (1977); Bradshaw v. McCarthy, 3 BRBS 195 (1976), petition for review denied, 547 F.2d 1161 (3d Cir. 1977). This court, as well, has struggled to interpret the phrase "maritime employment" in a way that facilitates predictable enforcement. See Prolerized New England Co. v. Benefits Review Board, 637 F.2d 30, 35-38 (1st Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 3080, 69 L.Ed.2d 952 (1981).
 
 
 8
 The Board's decision in the case before us is contrary to the expansive approach which it had itself adopted. Indeed, its holding is inconsistent with a recent ruling, clearly germane to this case, in which it determined that a sheet metal worker who repaired and maintained shipyard buildings was covered by the Act. Sills v. Newport News Shipbuilding & Dry Dock Co., 7 BRBS 976 (1978), aff'd mem. sub nom. Newport News Shipbuilding & Dry Dock Co. v. Director, OWCP, 591 F.2d 1340 (4th Cir. 1979). Realizing that the ruling in Sills would dictate a different result in Graziano, the Board chose simply to discard its earlier holding without explanation and in a footnote stated: "To the extent that Sills is inconsistent with the law as announced in the instant case, we decline to follow it." BRB Decision and Order at 5 n.2. Price v. Norfolk and Western Ry. Co., 618 F.2d 1059, exemplifies the liberal trend in construing the Act, and we find its reasoning applicable to the case at hand. In Price, the claimant was injured while painting, as part of routine maintenance, a support tower for a gallery belt system used in loading and unloading grain. The support tower itself was not a part of the gallery belt system. Citing Newport News Shipbuilding & Dry Dock Co. v. Graham, 573 F.2d 167, where a claimant was awarded compensation benefits for injuries sustained when he bumped against a machine he was oiling, and Bradshaw v. McCarthy, 3 BRBS 195, where a waterfront mechanic was granted benefits for a back injury received while repairing a forklift, the Price court held:
 
 
 9
 We can discern no significant distinction between the repair of machinery essential to the movement of maritime cargo and the painting of a structure essential to the loading and unloading of the same. Nor can we discern any significant distinction between oiling a machine used in building ships, as was the claimant in Graham, and painting a structure used in loading and unloading ships.
 
 
 10
 Price at 1061.
 
 
 11
 The maintenance of the structures housing shipyard machinery and in which shipbuilding operations are carried on is no less essential to shipbuilding than is the repair of the machinery itself. Just as the maintenance of the sandmill machine in Graham and the forklift in Bradshaw was necessary to accomplish the loading and unloading of ships, Graziano's maintenance and repair of shipyard facilities was essential to the building and repairing of ships. As in Price, 618 F.2d at 1062 n.4, the shipbuilding process of General Dynamics would not have come to an immediate halt if Graziano's duties were not successfully discharged, but the failure to perform routine maintenance would have led eventually to a stoppage or curtailment of shipbuilding and repairs. Therefore, on the basis of Graziano's masonry duties alone, we hold that coverage under the Act is mandated.
 
 
 12
 In reaching this result, we have considered appellee's claim that Graziano's duties parallel the unskilled support services denied coverage in Dravo Corp. v. Banks, 567 F.2d 593 (3d Cir. 1977). In Dravo, a maintenance-laborer who performed such unskilled jobs as cleaning up debris was excluded from coverage because his duties had "no traditional maritime characteristics, but rather (were) typical of the support services performed in any production entity, maritime or not." Id. at 595. We agree that those "support services equally suited to land-based enterprises, such as office clerical work, do not qualify as maritime employment." Prolerized New England Co. v. Benefits Review Board, 637 F.2d at 37; see also Maher Terminals, Inc. v. Farrell, 548 F.2d 476, 477 (3d Cir. 1977). But unlike the duties in Dravo or the clerical employment in Maher, Graziano's work was a necessary link in the chain of work that resulted in ships being built and repaired. We think "he falls within the broad concept of maritime employment," Prolerized New England Co. v. Benefits Review Board, 637 F.2d at 37-38, which the Act covers.
 
 
 13
 In addition to finding Graziano's overall masonry duties insufficient for status coverage under the Act, the Board specifically found Graziano's maintenance of the shipyard's acid tanks and steel mill boilers to be inadequate to confer coverage because of the amount of time in which Graziano was engaged in performing these services. The Board acknowledged that such work might "arguably" constitute maritime employment as repair of shipyard equipment, but refused to so hold because
 
 
 14
 there (was) no evidence in the record that claimant spent a substantial portion of his time in these activities. In Boudloche v. Howard Trucking Co., Inc., 11 BRBS 687, BRB No. 78-383 (1979), the Board held that a claimant's maritime-related duties must constitute a substantial portion of his overall employment in order for him to qualify as a maritime employee.
 
 
 15
 The Board's opinion in Boudloche is no longer valid precedent. The Fifth Circuit reversed the Board, Boudloche v. Howard Trucking Co., Inc., 632 F.2d 1346, determining that its decision was at odds with two recent Supreme Court rulings, Northeast Marine Terminal Co., Inc. v. Caputo, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320, and P. C. Pfeiffer Co., Inc., v. Ford, 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979). Caputo defined longshoremen eligible for coverage as "persons whose employment is such that they spend at least some of their time in indisputably longshoring operations and who, without the 1972 Amendments, would be covered for only part of their activity." Caputo, supra, 432 U.S. at 273, 97 S.Ct. at 2362. Two years later, Ford reinforced the same concept: "A worker responsible for some portion of that (longshoring) activity is as much an integral part of the process of loading and unloading a ship as a person who participates in the entire process." Ford, supra, 444 U.S. at 82-83, 100 S.Ct. at 337-38. In rejecting the Benefit Review Board's analysis, the Fifth Circuit reasoned that "(b)y substituting its 'substantial portion' language for the Court's 'some' in the coverage definition, the Board has departed from the letter and spirit of the High Court's rule. This, of course, it cannot do." Boudloche v. Howard Trucking Co., Inc., 632 F.2d at 1348. Although only 2.5 to 5 percent of Boudloche's overall employment was maritime in character, the Fifth Circuit extended coverage because "he was directed to regularly perform some portion of what was indisputably longshoring work." Id. Similarly, Graziano occupies a status covered by the Act because a regular portion of his overall employment entailed cleaning out acid tanks and steel mill boilers, work which is indisputably maintenance of shipbuilding equipment.
 
 
 16
 Our finding of covered employment is reinforced by the principle that "doubtful questions should be resolved in favor of the injured employee in order to place the burden of possible error on the employer who is better able to avoid the error and avoid the loss." Prolerized New England Co. v. Benefit Review Board, 637 F.2d at 38.
 
 
 17
 Reversed.
 
 
 18
 CAMPBELL, Circuit Judge (dissenting).
 
 
 19
 The essential difficulty we face in this and other like cases under the Longshoremen's and Harbor Workers' Compensation Act is giving the status term, "maritime employment," some meaning as applied to the work activities of a shipyard. The Act has both a status and a situs requirement. While Graziano met the situs standard-he was working at a shipyard-he was not meaningfully engaged in maritime employment. In my view, the logic of today's opinion simply reads the status requirement out of the Act. It grants federal rather than state compensation coverage to shore-based employees doing work indistinguishable from that done at garden variety industrial plants. Rather than take such a step, sub silentio, I feel this court has a duty to attempt to give meaning to both the status and situs requirements as Congress and the Supreme Court have suggested we should. I therefore respectfully dissent.
 
 
 20
 The Act, itself, was originally passed to fill a gap in the workmen's compensation scheme. That gap was the result of the Supreme Court's decision in Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917), which held that under the Constitution the states were without power to extend their own workmen's compensation to longshoremen whenever they were injured on navigable waters rather than on land. Congress responded in 1927 with the Longshoremen's and Harbor Workers' Compensation Act, designed to fill in this gap in coverage. During the next 45 years the courts struggled with the scope of federal coverage under the Act, finally determining that the "water's edge" defined the line of federal coverage. Longshoremen and harbor workers injured while working ashore had to rely on state coverage; only those injured while on the ship side were federally covered.
 
 
 21
 This construction of the Act was altered by the 1972 Amendments. The 1972 Amendments specifically extended the Act's coverage shoreward. The Act thus expanded the physical situs covered by the Act to include navigable waters and "any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel." 33 U.S.C. § 903. This expansion of geographical scope, however, made it necessary to describe limits on the class of employees Congress intended to compensate. Congress therefore added the status requirement that the injured worker be "engaged in maritime employment." This, in turn, was defined and limited to a "longshoreman or other person engaged in longshoring operations, and any harbor worker including a ship repairman, shipbuilder, and shipbreaker...." 33 U.S.C. § 902(3).
 
 
 22
 Since 1972, the courts have again struggled to draw meaningful lines defining the scope of coverage under this new regime. The two Supreme Court cases cited by the majority are indicative of both the direction the courts have taken and the possible limits of coverage under the 1972 Amendments. In Northeast Marine Terminal Co. v. Caputo, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977), the Court found that a cargo "checker" who worked both on the shore side and the ship side of a pier and a regular longshoreman who was injured on land while loading cargo onto trucks were both covered by the Act. Both men spent a portion of their regular working time on vessels and a portion on land. However, under the pre-1972 Act they would not have been covered because their injuries occurred on land.
 
 
 23
 The Court held, however, that the 1972 Amendments were intended to cover "persons whose employment is such that they spend at least some of their time in indisputably longshoring operations and who, without the 1972 Amendments, would be covered for only part of their activity." Id., at 273, 97 S.Ct. at 2362. The two men were covered because they spent at least part of their time doing indisputably longshoring work and because, without the 1972 Amendments, they would have been covered for only their shipboard work. The Court noted, however, that a truck driver or a clerical worker on the situs would not be covered.
 
 
 24
 The Court clarified this limitation in P. C. Pfeiffer Co. v. Ford, 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979). In Pfeiffer, the Court found that two shipyard warehouse employees, who were injured while loading and unloading cargo, were covered by the Act despite the fact that their work never took them on board a ship. The Court stated that the status requirement of the Act did not depend upon situs considerations such as whether the employee worked occasionally beyond "the water's edge." Rather, the Court adopted a functional approach. Since the warehousemen were engaged in "the type of duties that longshoremen perform in transferring goods between ship and land ...," id., at 81, 100 S.Ct. at 337, and they were an "integral part of the unloading process," id. at 75, 100 S.Ct., at 333, they were covered by the Act.
 
 
 25
 The circuit courts have widely adopted-and expanded-versions of this "integral function" test as applied to maritime activities. This court's decision in Prolerized New England Co. v. Benefits Review Board, 637 F.2d 30 (1st Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 3080, 69 L.Ed.2d 952 (1981), is an example. There, we held that a shipyard worker who operated and repaired equipment which cut and specially adapted scrap metal to prepare it for loading onto ships was covered by the Act even though he also spent time maintaining non-maritime equipment and was classified as a "maintenance man." Using a functional analysis, we said that because a substantial number of the employee's activities involved him in integral parts of the loading process, he was covered. Closer to the facts of Pfeiffer was our opinion in Stockman v. John T. Clark & Son, 539 F.2d 264 (1st Cir. 1976), cert. denied, 433 U.S. 908, 97 S.Ct. 2972, 53 L.Ed.2d 1092 (1977), where we found that employees who stripped cargo containers on a pier were covered.
 
 
 26
 The same expansive approach has been applied to employees engaged in shipbuilding or ship repair, with the result that ever increasing numbers of employees who were never covered under the Act before can now claim benefits. Thus, men maintaining the special machines and parts used in shipbuilding and repair have been held to be covered by the Act just as are actual shipwrights. Newport News Shipbuilding & Dry Dock v. Graham, 573 F.2d 167 (4th Cir.), cert. denied, 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 190 (1977) (sandblaster of shipbuilding equipment covered). It should be noted, however, that the application of this "integral function" test as applied to employees not fully engaged in actual loading, ship repair or shipbuilding-the "core" activities which would seem to be "indisputably maritime"-is an expansion of the test as it was used in Pfeiffer. There, the Court merely reached out to embrace land-based employees doing core work which ship-based employees might have done. As applied in the circuits, however, the test has reached a second class of employees who perform support services which are once or twice removed from the activities we traditionally think of as "maritime" in nature.
 
 
 27
 Until today, however, the courts have agreed that a third category of shipyard employees is indisputably not covered by the Act. These are shipyard workers whose functions are not tied into actual production or repair work, such as the unskilled maintenance man in Dravo Corp. v. Banks, 567 F.2d 593 (3d Cir. 1977), and the clerical worker in Maher Terminals, Inc. v. Farrell, 548 F.2d 476 (3d Cir. 1977). In sum, three categories of employees have emerged-the "core" and shipbuilding equipment maintenance workers, who are covered; and the miscellaneous shipyard employees who are not.
 
 
 28
 Graziano's case must fall within either the second or third of these categories. Graziano, according to the ALJ, spent most of his time doing routine masonry and maintenance work on the buildings in the shipyard. He occasionally-and the record suggests to me that these jobs came up only rarely-helped to repair large acid vats and boilers in the steel mill and the pipe shop. Thus, the question becomes first whether Graziano's primary functions as a mason were "integrally related" to the loading, repair or building of ships. Secondly, if his usual work did not qualify him, we need to ask whether his occasional repair of the vats and boilers-special equipment which is essential to the shipbuilding and repair functions of the yard-nevertheless entitles him to benefits as a maritime employee. The majority answers both questions affirmatively, suggesting, however, that either ground would be sufficient to support an award of benefits.
 
 
 29
 On the first question, I find the facts of our case closer to the maintenance man in Dravo than to the cited cases of painters and sandblasters. Graziano's primary duties, according to the Board, "did not involve the repair and maintenance of shipbuilding equipment; rather, they involved the repair and maintenance of the buildings located on employer's facility." Similarly, the ALJ found that Graziano's work involved maintaining the "physical integrity of the employer's shipbuilding plant," not, we may infer, of the essential equipment used in making or repairing ships. It seems to me that these findings describe the claimant in Dravo as well as our claimant. It is no less essential to clear the debris from the shop floors than to keep the masonry and plumbing of the buildings in shape. Both are support activities more removed than "integrally related" to the job of cleaning the hulls and repairing the decks of ships. I thus disagree with the court's characterization of the masonry work performed by Graziano as "integrally related" to shipbuilding. Unless the "integral function" test is to sweep into its net everyone at the situs whose presence contributes to the operation of the yard-which logically means watchmen, clerks and general yard maintenance personnel-I do not see how we can include those who repair and maintain buildings. To be sure, there must be buildings if ships are to be built but so also must there be security and paperwork.
 
 
 30
 As to the second ground of decision, the court takes the Supreme Court's language referring to people who "spend at least some of their time in indisputably longshoring operations" out of context and stretches the words so as to fundamentally alter the scope of the Act. When the Supreme Court spoke in Caputo of covering employees who were engaged "at least some of the time" in indisputably longshoring activities (a core activity), it was referring, as the full quotation indicates, to people who spent only some (not all) of their time loading on board ship. Pfeiffer extended this to include workers who were engaged in some portion of the core activity of loading and unloading and who worked exclusively on land.
 
 
 31
 The majority opinion, however, would apply the Supreme Court's "some of the time" language to activity which is far removed from the core work of loading, repairing and building. Under this analysis, anyone (the clerk in Maher, for instance) who spent as little as 21/2 to 5 percent of their time (the amount of time spent by the employee in Boudloche) engaged in such secondary support activities as oiling the engine of a forklift or painting a shed in the shipyard would qualify for coverage as fully as the bona fide shipwright. This seems to me to stretch the language of the Act beyond recognition. Congress introduced the status requirement ("maritime employment") in 1972 by way of limiting coverage. The court's rationale in today's opinion all but eliminates that legislative limitation.
 
 
 32
 It is probably too late to question the applicability of the Act to the general category of "support" employees whose sole "maritime" attribute is that they maintain equipment used in actual shipbuilding. Indeed, our own cases have found such workers to be covered, though it is worth noting that the employee in Prolerized New England v. Benefits Review Board, 637 F.2d 30 (1st Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 3080, 69 L.Ed.2d 952, 49 U.S.L.W. 3931 (June 15, 1981), spent a portion of his time actually on ships. I do think, however, that it would be well within the intent of the Act if we required those employees whose claimed maritime status hinges on such secondary support activities to show that they were engaged in their "integrally related" support work as their primary duty and during a substantial portion of their working time. This would be consistent with the facts we confronted in Prolerized New England and would also insure that building maintenance workers and clerical employees whom the courts agree are not covered, could not gain coverage by occasionally fixing a forklift when the regular mechanic was sick.
 
 
 33
 Thus, while, as required by the Supreme Court, anyone who performs "core" activity-i. e., actual shipbuilding or longshoring-only some of the time would be fully covered by the Act, those who perform only activities in support of such "core" maritime work would have to meet the Board's Boudloche test, which requires claimants to show that they are engaged in maritime employment a "substantial portion of their working time." Thus, equipment maintenance and repair would have to take up a substantial portion of their time. This limited use of the Boudloche test neither offends the Court's Pfeiffer holding nor is inconsistent with the Fifth Circuit's view in Boudloche v. Howard Trucking Co., 632 F.2d 1346 (5th Cir. 1980); the employee in the latter case spent "some of the time" in the core maritime activity of actual loading and unloading ships and was thus covered under Pfeiffer.
 
 
 34
 Graziano would fail to qualify for federal coverage under such an analysis. The ALJ found only that he repaired boilers and acid tanks as a portion of his duties while indicating that his primary job was maintaining the physical integrity of the entire plant. The record strongly suggests that the former duties were only very occasional. Since Graziano's duties did not involve him a substantial amount of the time in the maintenance and repair of equipment specifically used in maritime work, he would not be covered.
 
 
 35
 I am keenly aware that drawing such a line may add to the complexity of the analysis we must undertake in these cases. Under the test I propose, a painter who paints shipbuilding equipment a substantial portion of his time would be covered while one who paints mostly shipyard buildings would not. It is, I recognize, tempting to say that we should open the doors to all shipyard employees, regardless of function, so long as they are employed by a shipbuilding or longshoring company and work on the situs. This test would have the virtue of being evenhanded and easy to administer. However, it reads the status requirement out of the Act, a step more legitimately left to Congress than to this court. After all, most industrial activities are covered by state compensation laws; there is no necessary reason why a non-maritime employee doing shore-based work similar to that done in any non-maritime facility should be awarded federal rather than state coverage. Because I feel today's opinion has the effect of abolishing the status requirement-without saying so expressly-I respectfully dissent.
 
 
 
 *
 Of the District of Massachusetts, sitting by designation
 
 
 [1]
 The 1972 Amendments were designed to expand the preexisting "navigable waters of the United States" situs requirement, 33 U.S.C. § 903(a) (1927), to include employes engaged in maritime employment on "any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel," 33 U.S.C. § 903(a) (1972). At the same time, Congress imposed a "status" requirement on workers, limiting eligibility to employees whose employment was of a maritime nature. See, supra, at pp. 340-341. The 1972 Amendments thus transformed what had been historically only a "situs" test of eligibility into a two-pronged test involving both "situs" and "status."
 
 
 [2]
 The definition of "employee" makes clear that the category of persons engaged in maritime employment includes more than longshoremen and persons engaged in longshoring operations. The subcategories "ship repairman" and "shipbuilder" are most closely analogous to Graziano's duties of employment