691 F.2d 45
 PROLERIZED NEW ENGLAND COMPANY, and CNA Insurance Company, Petitioners,
v.
Calvin D. MILLER, Benefits Review Board, United States
Department of Labor, and Director, Office of
Workers' Compensation Programs, United
States Department of Labor, Respondents.
 No. 82-1209.
 United States Court of Appeals,
First Circuit.
 Argued Sept. 14, 1982.
Decided Oct. 12, 1982.
 
 David M. Mandel, Boston, Mass., with whom Richard P. Ward, Ropes & Gray, Terrance J. Hamilton, and Chaplin, Casner & Edwards, Boston, Mass., were on brief, for petitioners.
 Joshua T. Gillelan, II, Atty., U. S. Dept. of Labor, Washington, D. C., with whom T. Timothy Ryan, Jr., Sol. of Labor, and Donald S. Shire, Associate Sol., Washington, D. C., were on brief, for respondent Director, Office of Workers' Compensation Programs.
 Before DAVIS*, CAMPBELL and BOWNES, Circuit Judges.
 BOWNES, Circuit Judge.
 
 
 1
 This is a proceeding brought by Prolerized New England Company and CNA Insurance Company (hereinafter jointly Prolerized) pursuant to 33 U.S.C. § 921(c) of the Longshoremen's and Harbor Workers' Compensation Act (the Act) to review a decision of the Benefits Review Board, Miller v. Prolerized New England Co., 14 Ben.Rev.Bd.Serv. (MB) 811 (1981). The Board's decision affirmed the administrative law judge's (ALJ) finding that the claimant was covered under 33 U.S.C. § 902(3).[1] Prolerized stipulated that its facility was a covered "situs" within the meaning of 33 U.S.C. § 903(a).[2] The sole issue, therefore, is whether the "status" determination of the Board was correct. This hinges on whether a prior opinion of the Board concerning the same employer and subsequently affirmed by us is controlling precedent. We agree with the ALJ and the Board that Prolerized New England Company v. Benefits Review Board and Richard F. McNeil, 637 F.2d 30 (1st Cir. 1980), cert. denied, 452 U.S. 938, 101 S.Ct. 3080, 69 L.Ed.2d 952 (1981) (hereinafter McNeil), requires a finding that the claimant here was covered under the Act.
 
 
 2
 A full description of Prolerized's operations is set forth in McNeil, 637 F.2d at 33-34, and need only be summarized here. Prolerized processes and sells scrap metal. The product is loaded aboard ships moored at Prolerized's dock by equipment owned, maintained, and operated by Prolerized. The operations start with the delivery of scrap metal to Prolerized's plant. The bulky material consisting of junked cars, discarded appliances, and similar items go to the "Prolo Mill." There they are reduced to fist-sized chunks of metal called "prolo." The prolo is moved from the mill by means of a conveyor belt to a radial stacker which deposits it in piles in a large yard. Bulldozers then push the prolo onto the "shiploader," another conveyor which deposits it into the holds of the ships being loaded.
 
 
 3
 The nonbulky scrap (about 40% of the raw material) consisting of large pieces of steel goes to the "Shear," a machine which cuts the steel into short lengths of four feet or less. This product is stockpiled and then moved by truck to the dock where it is loaded by gantry cranes into the waiting ships.
 
 
 4
 A comparison of McNeil's duties and that of the claimant here, Calvin D. Miller, is the first step in our analysis.
 
 
 5
 The claimant, McNeil, had worked at Prolerized as a maintenance man for two and one half years before he was injured. The Administrative Law Judge (ALJ) found that his duties involved the maintenance and repair of "all company equipment", and that he had in fact worked on all of the equipment at the facility, including the Shear, Prolo Mill and shiploading equipment. The ALJ also found that McNeil was required "on occasion" to go aboard ship and assist directly in loading or repair loading equipment that had broken down during the loading process.
 
 
 6
 McNeil, 637 F.2d at 33.
 
 
 7
 In the case before us, Miller had testified that he worked as a maintenance mechanic on any pieces of equipment that broke down. His duties included maintenance of the Prolo Mill and all the conveyors. He worked on the radial stacker and helped weld and erect a new one. He also repaired and maintained the shiploader. On occasion, he helped to position the collar and shute of the shiploader on a ship.
 
 
 8
 Based on the evidence, the Board supportably found that "(c)laimant's duties usually involved work on either the prolerizer machinery, the conveyors inside the prolerizing mill, the conveyors extending from the mill to the radial stacker or the radial stacker." App. at 197.
 
 
 9
 The similarity between the work done by McNeil and Miller is striking. Both were maintenance men with a responsibility for almost all the company equipment. The one difference in their duties was that McNeil operated and maintained the Shear; although Miller had helped construct the Shear and had serviced it, he did not operate it. Miller's regular duties, however, included work on the conveyors that carried the prolo from the mill to the radial stacker and the repair and maintenance of the stacker itself. The injuries sustained by Miller occurred while he was lifting a heavy shaft which was part of a new radial stacker which he was helping to construct.
 
 
 10
 We agree with the Board that the stacker, like the Shear, is an integral part of the loading process. It's only function is to position the prolo so it can be loaded on board ship. Neither the stacker nor the conveyor leading to it are part of the manufacturing process carried on in the Prolo Mill. The line we drew in McNeil that work done in the Prolo Mill is akin to manufacturing, and not part of the loading process, has not been crossed, nor has its location been shifted. McNeil, 637 F.2d at 36. As with the Shear, the radial stacker is a "physically distinct part of the employer's operation whose sole function is to prepare goods for shipment." 637 F.2d at 37. Because part of claimant's regular duties was the repair and maintenance of the radial stacker, his "status" was that of a longshoreman under the Act.
 
 
 11
 Affirmed.
 
 
 12
 LEVIN H. CAMPBELL, Circuit Judge (concurring).
 
 
 13
 In Graziano v. General Dynamics Corp., 663 F.2d 340 (1st Cir. 1981) I made the point in a dissenting opinion that the Longshoremen's and Harbor Workers' Compensation Act has "both a status and a situs requirement," and that to meet the former, the injured worker must be engaged in "maritime employment." 663 F.2d at 344. I thought in Graziano that the court's analysis read the status requirement out of the Act. I have a similar reaction to the court's approach here-as well as to its approach in the earlier Prolerized New England (McNeil) case, 637 F.2d 30 (1st Cir. 1980).
 
 
 14
 The prolo does not really go straight from the stacker to the ship as the court implies here. Rather it is bulldozed off to the side, to await loading which occurs at most twice a month whereas the stacking is presumably a daily activity. Thus I think we stretch matters to say that the stacker "position(s) the prolo (for) loading on board ship."
 
 
 15
 It seems strange to call the stacking of manufactured goods a maritime activity merely because it is contemplated that they will eventually be picked up and placed on a vessel. Every manufacturer must store the goods he has just manufactured pending their collection and shipment. Such storage would logically seem more a part of the manufacturing phase than of the particular method of transportation that will later be employed to move the goods to purchasers and users. If the goods are to go by rail, does that make rail workers of the manufacturer's employees who stack them pending collection and shipment?
 
 
 16
 If the prolerizing process here in issue had occurred in the middle of Kansas, with the finished goods being stacked in exactly the same way awaiting shipment by rail to a seaport, I hardly believe anyone would think to describe the stacking as a maritime operation. I fear that as in Graziano the court has been induced by the location of the activity at a maritime situs, and by an understandable desire for simplicity and uniformity of application, to pay less than serious attention to the status ("maritime employment") requirement.
 
 
 17
 This might seem a trivial issue were it not that the court's expansive reading of the Act has the effect of greatly extending a federal program that was never meant to have general application. The Act was only meant to provide coverage for a specific group of workers-longshoremen and other typically maritime workers-over whom the federal government has historically had special jurisdiction. Beyond workers of this sort, for whom the states were once thought to be powerless to provide workmen's compensation, the provision of workmen's compensation has always been a state function. To expand federal coverage constitutes an ouster of the states in areas where there is no apparent federal interest.
 
 
 18
 Having said this, I add that the chief blame for confusion in this area rests with Congress not the courts. The Act itself is irresponsibly lacking in clarity as to the specific groups to be covered.
 
 
 19
 For right or wrong, this circuit now seems firmly set on a particular path. Under principles of stare decisis it seems appropriate for me to accept that interpretation even though I disagree with it. I therefore concur.
 
 
 
 *
 Of the Federal Circuit, sitting by designation
 
 
 [1]
 33 U.S.C. § 902(3) provides in pertinent part:
 (3) The term "employee" means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations ....
 
 
 [2]
 33 U.S.C. § 903(a) provides in pertinent part:
 (a) Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).