## CIRCUIT COURT OF THE CITY OF NORFOLK

Robert T. Goode, Jr.

v.

Norfolk and Western Ry. Co.

November 13, 1986

Case No. (Law) L-86-335

By JUDGE CHARLES R. WATERS, II

If this case were one of first impression, I would be tempted to rule that the Congress, by enacting the Longshoremen's and Harbor Workers' Compensation Act (L.H.W.C.A.), did not intend to strip a railroader of any of his benefits under the Federal Employer's Liability Act (F.E.L.A.) under any circumstances so long as he was working for the railroad at the time of injury, a narrow, unintellectual approach which makes good sense.

The duty of this court, however, is not to make law but to interpret and follow the law as set forth by courts of higher dignity. In following that duty, I feel that I am directed by the existing law to rule that, under the particular facts of this case, the motion for judgment must be dismissed for reason that exclusive jurisdiction lies within the ambit of the L.H.W.C.A.

Railroad cars filled with coal come cross country in both interstate and intrastate commerce and come to rest in what is called the barney yard located near pier 6 at the Lambert's Point terminal in Norfolk, Virginia. After the coal has come to rest in the barney yard, the process of loading the coal into vessels begins. The loaded

cars are moved from the barney yard through a thawing shed and are then pushed up a raised track by small locomotives called pushers onto the dumper located near the piers. As these loaded cars are pushed on to the dumper, their progress is slowed or stopped by equipment known as a retarder. The cars revolve, dumping the coal onto conveyor belts which deliver the dumped coal directly into the holds of waiting vessels docked at the piers. The empty cars are pushed to the apex of the raised track and then, through the force of gravity, are returned to a holding yard from where they will again be dispatched to coal fields located in various parts of the country.

The plaintiff was a machinist who was injured while repairing the retarder on the dumper located near pier 6. The dumper and retarder on which the plaintiff was working are located 500 to 550 feet from the water. Retarders are located throughout the railroad system; however, the sole purpose of this retarder was to stop the loaded cars on the dumper to facilitate the transportation of coal from shore to vessel by dumping the coal on conveyor belts which feed the coal into the belly of docked vessels at pier 6. The entire loading operation at pier 6 must cease when the retarder is inoperative or is being repaired. and the loading operation had in fact ceased at the time of the injury to the plaintiff.

Machinists may be assigned to what is known as the Motive Power Department which has the function of maintaining and operating the coal dumping facility of the railroad. Machinists may be assigned to different locations such as the 38th Street car shop or the roundhouse, which may be miles away from the water, or they may be assigned to Lambert's Point. The location is determined by seniority, and a machinist working at the pier at Lambert's Point may be forced to work at another location because of the electing of a more senior machinist to work at the pier. At the time of the accident, the plaintiff had been assigned for some time to work at Lambert's Point. While assigned to Lambert's Point, machinists spend the overwhelming portion of their working time maintaining and repairing machines and equipment essential to the coal dumping operation. Machinists do not, for example, regularly repair cars, for that is the job of trainmen. The great majority of the working time of a machinist while assigned

to Lambert's Point is spent on the maintenance and repair of machinery which facilitates the dumping operation after the cars have left the barney yard. The machinists are required to pay into the railroad retirement plan and are subject to the Railway Labor Act.

Under the facts of this case, the railroad is an employer within the meaning of the L.H.W.C.A., *Noqueira v. New York, N.H. & H. R. Co.*, 281 U.S. 128, 132, 44 L. Ed. 754, 50 S. Ct. 303 (1930), and the plaintiff is an employee within the meaning of the L.H.W.C.A., *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 53 L. Ed. 2d 320, 97 S. Ct. 2348 (1977); *P.C. Pfeiffer Co. v. Ford*, 444 U.S. 69, 62 L. Ed. 2d 225, 100 S. Ct. 328 (1979), and he cannot walk in and out of coverage because, I believe, that the overwhelming portion of his work is essential to the loading and unloading operation.

The Supreme Court in *Herb's Welding v. Gray*, 105 S. Ct. 1421, 84 L. Ed. 2d 406 (1985), while holding that a welder working on a fixed offshore oil-drilling platform was not engaged in maritime employment within the meaning of L.H.W.C.A., has stated:

> But Congress did not seek to cover all those who breathe salt air. Its purpose was to cover those workers on the situs who are *involved* in the *essential elements* of loading and unloading. (Emphasis added).
>
> We have never read "maritime employment" to extend so far beyond those *actually involved in moving cargo between ship and land transportation.* (Emphasis added).

On the facts of this case, I hold that the plaintiff was involved in the essential elements of loading and unloading and that he was actually involved in moving cargo between ship and land transportation. After all, the entire loading operation ceased during the repair of the retarder on which the plaintiff was working when injured. The location of the retarder was on the dumper, and the sole purpose of this particular retarder was to stop coal-loaded cars so that the coal could be dumped onto the belts feeding the vessel. It must be remembered that plaintiff's supervisors testified that 99 percent

of the work of a machinist assigned to Lambert's Point was the maintenance and repair of machines and equipment directly and solely related to the loading and unloading operation. Even the most biased witnesses could not seriously testify that less than 50 percent of the work was not so related, while the machinist was assigned to Lambert's Point.

The plaintiff places a great deal of emphasis on *White v. N. & W. Ry. Co.*, 217 Va. 823 (1977), decided in the same year as *Conti v. N. & W. Ry. Co.*, 566 F.2d 890 (4th Cir. 1977).

It is my belief that, under the facts of this case, the plaintiff did have "a realistically significant relationship to the loading of cargo on ships" and that he was directly involved in the process of loading coal on the vessels within the meaning of the *White* test. Furthermore, this case does involve a federal question, the federal authorities are therefore the more persuasive, and to the extent that *White* differs from significant federal decisions, the *White* court, in my opinion, must yield.

As counsel well know, there have been a number of significant decisions subsequent to *White*, one of the leading decisions being *Price v. Norfolk & Western Ry. Co.*, 618 F.2d 1059 (4th Cir. 1980). In my opinion, the *Price* court did set forth the proper test in determining whether there is exclusive coverage under the L.H.W.C.A., that test being whether the plaintiff's job was an essential element in the loading and unloading of the vessels. I hold that in this case, the plaintiff's job was an essential element, although in light of the later ruling in *Herb's Welding, supra*, I would not hold that the painter's job in the *Price* case was an essential element.

I believe that *Newport News Shipbuilding & Dry Dock v. Graham*, 573 F.2d 167 (4th Cir.), *cert. den.*, 439 U.S. 979, 58 L. Ed. 2d 649, 99 S. Ct. 563 (1978), fortifies my opinion in this case, and I do not think that this opinion is in substantial conflict with *Conti v. N. & W. Ry. Co.*, 566 F.2d 890 (4th Cir. 1977), although I do agree with the D. C. Circuit Court that even before *Herb's Welding, supra*, the Fourth Circuit had moved away from a test of balancing traditional railroad tasks against

traditional maritime tasks. *Harmon v. Baltimore & Ohio RR.*, 741 F.2d 1398 (D.C. Cir. 1984).

I am cognizant of my colleague's decision in *Evans v. N. & W. Ry. Co.* (Norfolk Circuit Court 1985), but likewise do not feel that we are in conflict. After a close reading of his decision, I believe that, under the facts of this case, Judge Clarkson would have reluctantly reached the same decision which I have reluctantly reached.

With regard to the situs test, I hold that the most important factor is the nature of the work rather than the distance from the water and that the test has been met. *Graham*, supra; *Prolerized New England Co. v. Miller*, 691 F.2d 45 (1st Cir. 1982); *Prolerized New England Co. v. Ben. Rev. Bd.*, 637 F.2d 30 (1st Cir. 1980); *cert. den.* 452 U.S. 938, 101 S. Ct. 3080, 69 L. Ed. 2d 952 (1981); *Sea-Land Serv. v. Director, etc.*, 685 F.2d 1121 (9th Cir. 1982); *Garvey Grain Co. v. Director, etc.*, 639 F.2d 366 (7th Cir. 1981).