Patrick A. CONLIGIO, Plaintiff,

v.

**NORFOLK AND WESTERN RAILWAY COMPANY, Defendant.**

Civ. No. 86–CV–75261–DT.

United States District Court,
E.D. Michigan, S.D.

Sept. 21, 1987.

Arvin Pearlman, Southfield, Mich., for plaintiff.

Carson Grunewald, Detroit, Mich., for defendant.

## MEMORANDUM AND ORDER

COHN, District Judge.

### I. Introduction

This is a Federal Employers' Liability Act (FELA) case, 45 U.S.C. § 51 et seq. Counts III and IV of the complaint allege that plaintiff, while working as a locomotive engineer, was injured at defendant's Boat Yard in May 1984.[1] Before the Court is defendant's motion for summary judgment for lack of subject matter jurisdiction on the ground that because plaintiff was engaged in the process of loading railcars onto a barge in the Detroit River for shipment to Canada at the time of his injuries, his exclusive remedy lies under the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901, *et seq.* Plaintiff opposes the motion on the grounds that because his injuries were not sustained in an area adjoining navigable

---

**1.** Count I simply alleges the jurisdictional basis for the case; Count II alleges an unrelated inci-

dent.

waters and occurred within the scope of his employment as a railroad worker, an action under the FELA is the appropriate remedy. For the reasons which follow, the motion is GRANTED, and Counts III and IV of the complaint are DISMISSED.

## II. Undisputed Facts

On May 20, 1984 plaintiff reported to work at defendant's Boat Yard and was assigned to Job 8, which primarily involved loading railcars destined for Canada onto barges in the Detroit River. The incident occurred while plaintiff was operating a locomotive in reverse in order to couple onto additional railcars on track 8 or 9 in defendant's "eastbound yard".[2] Work in the eastbound end of the Boat Yard involves trafficking of railcars going from Detroit to Canada across the river. The eastbound tracks connect directly to the tracks from which loading is done. Plaintiff's fieldman had signalled him to back up to the west to complete a particular coupling, but plaintiff apparently did not receive an "ease up" signal from his fieldman until after he had already coupled with the cars on the track. At the moment the coupling was executed, the locomotive lurched to a sudden stop, causing plaintiff's head to snap back. After the coupling was completed, plaintiff maneuvered the railcars to a slip along the river and loaded them onto a barge destined for Canada. After the loading was completed, plaintiff asked to be relieved of work and was taken to the hospital.

## III. The Two–Pronged Test

For employees subject to its provisions, the LHWCA is the exclusive remedy for injuries sustained on the job. *See* 33 U.S.C. § 905(a). The LHWCA preempts the FELA as to railroad employees "engaged in maritime employment." *Pennsylvania R.R. Co. v. O'Rourke,* 344 U.S. 334, 73 S.Ct. 302, 97 L.Ed. 367 (1952). If plaintiff meets both prongs of the applicable "situs and status" test, his remedy falls within the exclusive jurisdiction of the LHWCA and this action must be dismissed. *See P.C. Pfeiffer Co. v. Ford,* 444 U.S. 69, 73, 100 S.Ct. 328, 332, 62 L.Ed.2d 225 (1979).

The situs test is satisfied for an employee whose disability "results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel)." 33 U.S.C. § 903(a).

The status test is satisfied for an employee who meets the following description: "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreacher...." 33 U.S.C. § 902(3).

## IV. The Situs Test

### A.

Defendant argues that plaintiff meets the situs test because his injury occurred in the "eastbound yard," which is an "adjoining area customarily used for loading a vessel" on the Detroit River, a navigable water of the United States. The eastbound tracks, used for coupling railcars for shipment to Canada, adjoin the Detroit River and generally only contain cars destined for Canada. (*See* Affidavit of M.E. Kloth and Attachments). Defendant characterizes the coupling process on tracks 8 and 9 as the "beginning of the loading process."

Plaintiff denies that he meets the test.[3] Plaintiff argues that tracks 8 and 9 are used for "the making up of trains before they are loaded onto the barges." Plaintiff further argues that the tracks cannot be considered an area "customarily used in the loading and unloading process" because

---

2. A sketch of the Boat Yard displaying tracks 8 and 9 and their relationship to the Detroit River is attached. The parties declined an opportunity for an evidentiary hearing to determine the precise location and nature of the operation which plaintiff was performing at the time of the incident.

3. Plaintiff did not file a counter-affidavit. Plaintiff's pretrial deposition testimony is rather vague as to the concise configuration of the Boat Yard and the exact nature of the work he was performing at the time of the incident.

the tracks are customarily used in the "making up of trains, which is traditionally and by its very nature railroad work." Plaintiff contends that the process of loading the barge began only after the coupling of railcars had been completed and long after the cars left tracks 8 and 9.

### B.

Plaintiff's argument is without merit. The 1972 amendments to the LHWCA, Pub.Law 92–576, substantially extended its coverage shoreward. "With the definition of 'navigable waters' expanded by the 1972 amendments to include such a large geographical area, it became necessary to describe affirmatively the *class* of workers Congress desired to compensate." *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 264, 97 S.Ct. 2348, 2357, 53 L.Ed.2d 320 (1977) (emphasis added). The legislative history of the amendments indicates that the Senate and House Committees did not "intend to cover employees who are not engaged in loading, unloading, repairing, or building a vessel, just because they are injured in an area adjoining navigable waters used for such activity." *Director, Office of Workers' Compensation Programs v. Perini*, 459 U.S. 297, 317, 103 S.Ct. 634, 647, 74 L.Ed.2d 465 (1983). In determining coverage, the language of the 1972 amendments is broad and suggests that the courts take an expansive view of the extended coverage. *Caputo*, 432 U.S. at 268, 97 S.Ct. at 2359.

The situs test clearly must be broadly interpreted, with the status test, discussed below, operating to refine the parameters of the LHWCA's coverage. Neither party has cited any cases which stand for the proposition that a railroad yard adjoining a navigable water satisfies the situs test. However, a review of the cases that are cited by the parties leads to the conclusion that the "eastbound yard" satisfies the situs test, which apparently operates as more of a threshold requirement than a test with "teeth." Further, the "eastbound yard" falls directly within the expanded definition of navigable waters. 33 U.S.C. § 903(a). The undisputed affidavit of M.E. Kloth, who was Superintendent of the Detroit Ter-

minal, which includes the Boat Yard, during the relevant time period says that the "eastbound yard" customarily and almost exclusively contains railcars destined for shipment to Canada. Kloth further says that the eastbound tracks connect directly with the tracks used for loading the railcars onto barges in the river.

### V. The Status Test

### A.

Defendant says that plaintiff also satisfies the status test because at the time of his injury, he was "engaged in maritime employment." Defendant argues that when the injury occurred, plaintiff was engaged in the process of loading railcars onto a barge in the river, albeit he was technically a railroad employee.

Plaintiff argues that the "making up" of trains has no relationship to maritime activity and that the nature of this work would have been the same whether performed in the Boat Yard or any other part of defendant's yards.

### B.

The crucial factor in the concept of "engaged in maritime employment" is the *nature* of a worker's activities. *P.C. Pfeiffer Co. v. Ford*, 444 U.S. 69, 78, 82, 100 S.Ct. 328, 337, 62 L.Ed.2d 225 (1979). The LHWCA's explicit use of the terms "longshoreman" and "other person engaged in longshoring operations" to describe persons who would be considered "engaged in maritime employment" demonstrates that workers doing tasks traditionally performed by longshoremen are within the purview of the 1972 amendments. *Id.* at 82, 100 S.Ct. at 337. For example, persons who move cargo directly from land transportation to a ship are "engaged in maritime employment." *Id.* Another forumulation of the test is that employees who are on the situs and engaged in the overall process of loading and unloading vessels are covered. *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. at 267, 97 S.Ct. at 2358. It has also been stated that a worker responsible for *some* portion of such maritime activity is as much an *integral*

part of the process of loading or unloading a vessel as a person who participates in the *entire* process. *P.C. Pfeiffer Co.*, 444 U.S. at 83, 100 S.Ct. at 337.

The legislative history of the LHWCA indicates that workers intended to be covered were discussed solely in terms of *what* they are doing and never in terms of *where* they are working. *P.C. Pfeiffer Co.*, 444 U.S. at 80, 100 S.Ct. at 335. The congressional reports gave the following as an example of shoreward coverage involving the unloading of vessels: cargo, whether in break bulk or containerized form, is typically unloaded from the ship and immediately transported to a storage or holding area on the pier; the employees who perform this work would be covered. *Caputo*, 432 U.S. at 266, 97 S.Ct. at 2358. In a footnote to *Caputo, id.* at n. 28, 97 S.Ct. at 2359 n. 28, the Supreme Court qualified the congressional example by stating that it clearly was not intended to be exhaustive, because:

> [I]t is incontrovertible that workers engaged in the process of loading a ship and performing steps analogous to those mentioned in the example—that is, *moving cargo from storage and placing it immediately on the ship*—are covered.... (emphasis added).

Further, in *P.C. Pfeiffer, Co.*, 444 U.S. at 81, 100 S.Ct. at 336, the Supreme Court stated that although a worker who transports cargo to shipside need not board a ship to carry out his duty, he is incontestably a "longshoreman," directly engaged in the loading process.

There is no requirement that an employee spend a "substantial portion" of his time in maritime activities. Any employee is covered if he spends at least *some* of his time in indisputably longshoring operations and who, without the 1972 amendments, would be covered for only part of his activity. *Caputo*, 432 U.S. at 273, 97 S.Ct. at 2361; *see generally, Graziano v. General Dynamics Corp.*, 663 F.2d 340, 343–44 (1st Cir.1981).

**C.**

The Court concludes that plaintiff was "engaged in maritime employment" within the meaning of the LHWCA and that his remedy lies exclusively under its provisions. Plaintiff was involved in the direct movement of railcars between land and water transportation. *See P.C. Pfeiffer Co.*, 444 U.S. at 81, 100 S.Ct. at 336. Plaintiff was coupling railcars at the time of the incident in order to immediately load them onto a barge destined for Canada. After the coupling was completed, plaintiff maneuvered the railcars to the river and loaded them onto a barge. Concentrating on the *nature* of plaintiff's duties, he was engaged not only in a portion of the loading process, but in the entire, overall process of loading a ship.

Plaintiff draws too fine a line between covered and excluded activity. The "making up" of railcars for water shipment has a direct and immediate relationship to the loading process. Plaintiff was directly engaged in moving cargo from land to water transportation.

The United States Supreme Court expressly adopted an expansive definition of "maritime employment" because the legislative history of the 1972 amendments supported such a view and because "certainty of coverage" was crucial to the ameliorative purposes underlying the 1972 amendments. In *P.C. Pfeiffer Co.*, 444 U.S. at 83–84, 100 S.Ct. at 337–38, the Court stated that a "definition of maritime employment that reaches any worker who *moves cargo between ship and land transportation* will enable both workers and employers to predict with reasonable assurance who on the situs is protected by the 1972 Act." (Emphasis added). If Congress had wanted to exclude railroad workers who performed traditional longshoreman-type work, it could have done so. Congress was certainly aware of the Supreme Court's decision in *O'Rourke*, 344 U.S. 334, 73 S.Ct. 302, 97 L.Ed. 367 (1952), which extended the LHWCA coverage to railroad employees performing maritime employment.[4]

---

**4.** A footnote to this Court's Order in *LeBlanc v. Norfolk & Western Ry. Co.*, 673 F.Supp. 208 (E.D. Mich.1986), explains: The legislative history of the 1972 amendments is unclear as to the intend-

### D.

The majority of cases from the various federal circuit courts of appeal support the foregoing conclusion. These cases generally take an even more expansive definition of the "loading and unloading of vessels" than the facts require here.

In *Harmon v. Baltimore & Ohio R.R.*, 741 F.2d 1398, 1403 (D.C.Cir.1984), the court of appeals found that the LHWCA covered a railroad employee who, at the time of his injury, was repairing and maintaining equipment used in maritime activities, i.e., the loading of ships. The court of appeals found that the equipment was essential to the movement of maritime cargo from trains to ships and therefore, the repair and maintenance of such equipment must also be considered an integral part in the loading of ships. *Id.* The repair of equipment used in the loading of cargo on ships is much further removed from the "loading and unloading process" than plaintiff's job duties in this case.

In *Graziano v. General Dynamics Corp.*, 663 F.2d 340, 342–43 (1st Cir.1981), the court of appeals found that the LHWCA covered an employee who maintained the structures housing shipyard machinery and in which shipbuilding operations are carried out. The court of appeals found that such maintenance "is no less essential to shipbuilding than is the repair of the machinery.... necessary to accomplish the loading and unloading of ships." *Id. Graziano* found LHWCA coverage under circumstances one step further removed than *Harmon, supra.* The court of appeals in *Graziano* characterized the plaintiff's work as a "necessary link in the chain of work that resulted in ships being built and repaired." *Id.* at 343. Like *Gra-*

*ziano*, plaintiff's work in this case was a necessary link in the chain of work that resulted in railcars being loaded onto water transportation.

See also, *Price v. Norfolk & Western Rwy.*, 618 F.2d 1059, 1061 (4th Cir.1980) (the LHWCA covered an employee who was injured while painting the support towers for a structure used for the loading and unloading of grain onto vessels); *Hullinghorst Indus. Inc. v. Carroll*, 650 F.2d 750, 753, 755 (5th Cir.1981) (the LHWCA covered.a carpenter who acted solely as a scaffolding subcontractor on a pier repair project).

Plaintiff's reliance on *Conti v. Norfolk & Western Ry.*, 566 F.2d 890 (4th Cir.1977), is misplaced. See the analysis of *Conti* in *Harmon v. Baltimore & Ohio R.R.*, 741 F.2d at 1404.

*Weyerhaeuser Co. v. Gilmore*, 528 F.2d 957, 961 (9th Cir.1976), is also distinguishable because the employment at issue was not substantially related to navigation or commerce upon navigable waters where the employee was a "pondman" at a sawmill where logs were processed for shipping. Other than working in close proximity to a body of saltwater, the employee was not involved in any direct fashion in the loading or unloading of ships or any other maritime activity.

### VI. Conclusion

This is the second case in recent years on the Court's docket involving an incident at the Boat Yard which the Court has dismissed for lack of subject matter jurisdiction. Count II of the complaint relates a relatively less significant incident than do Counts III and IV. The Court is of the

---

ed effect on prior judicial interpretations of the Act. Thus, it is still for judges to determine who falls within the Act's coverage. It is said of the late Professor Uri Yadin, a famous Israeli legislative draftsman, "In his legislative drafting he ... strove to give only the essentials, without any exgive only the essentials, without any explanatory details. This not infrequently gave rise to criticism, but he was confident in his approach, relying on the creative function of the courts. He often responded to those who demanded greater detail: the courts will determine the solution." 20 Israel L.Rev. 442 (Autumn 1985).

This faith in the ability of judges finds support in the manner of judicial statutory construction in the second half of the twentieth century. Professor James Willard Hurst has written, "Courts now seem usually to strive to grasp the distinctive message of statutory words, taken in their own context, with reference to the documented process that produced that particular act, including legislative history deserving credibility, and policy guides supplied by the legislature's successive development of the given policy area and related areas." Hurst, *Dealing With Statutes* 65 (1982).

opinion that proceedings on Count II be STAYED while the parties obtain review of the dismissal of Counts III and IV. The dismissal involves a controlling question of law as to which there are substantial grounds for difference of opinion and an immediate appeal from the order of dismissal would materially advance the ultimate termination of this litigation. 28 U.S.C. § 1292(b). Certainly, the rights of railroad employees working in the Boat Yard who are involved in the loading and unloading of railcars to and from Canada needs definition.

SO ORDERED.